1    (On the record)

2              HEARING OFFICER DUNN: So we are going to go

3    on the record. First, we're at day 20 of Amazon.com

4    Services, LLC, case 29 RC 288020. The first thing I want

5    to do is admit Board Exhibit 3, which has been uploaded

6    to SharePoint.

7    (Board Exhibit 3 received)

8              It is the Board order dated July 11, 2022.

9    Next, I will ask the Employer, are you ready to call

10   your next witness?

11             MR. LARKIN: Yes, we're ready to call Mr.

12   Connor Spence.

13             HEARING OFFICER DUNN: Okay. And I'm told in

14   off the record discussion that there may be some

15   testimony implicated, relevant or pertaining to

16   Objections for which I have requested offers of proof.

17   Would you like to proceed with that at this time.

18             MR. LARKIN:  I would prefer to do it out of

19   the earshot of the witness, though.

20             HEARING OFFICER DUNN:  Yes. So if we could

21   have Mr. Spence go to a location other than with Ms.

22   Mirer or in the witness room where he can hear, I would

23   appreciate it.  And Ms. Mirer, if you can confirm that

24   that has been done and Mr. Larkin can get started.

25             MR. MILNER:  That has been done. He has left

1   my office.

2           HEARING OFFICER DUNN: Perfect. Thank you

3   very much.

4           MS. MIRER:  He's Going. Into it, he's

5   heading to the witness room, but not turning on the

6   computer.

7           HEARING OFFICER DUNN:  Okay, perfect. Mr.

8   Larkin?

9           MR. MILNER:  He's in another room now.

10          MR. LARKIN:  Yes. Okay. So I'll begin, I

11  guess, with the Objections on which you have asked for

12  offers of proof on the grounds that the presentation may

13  be cumulative at this point. So with respect to

14  Objection 6 through 8, the Union produced documentation

15  regarding the identity of the ALU's observers. So I

16  would question Mr. Spence about that. I would also

17  question him about some communications from the Union

18  regarding voting times and when employees could vote.

19  There's been testimony about that issue in the case. So

20  I'd ask him some questions about that. So that's 6 to 8.

21          HEARING OFFICER DUNN:  Okay. That's

22  permitted.

23          MR. LARKIN: Okay. Objection 15, I would ask

24  him some questions about his own participation in the

25  removal of Amazon campaign materials. And then I would

1   ask him to authenticate some communications relating to

2   the small group meeting testimony that we've heard to

3   this point, including, I think, a couple of new things

4   that we have not introduced with other witnesses to this

5   point.

6           HEARING OFFICER DUNN:  Okay. That's also

7   permitted.

8           MR. LARKIN:  Okay. Objection 16, there are

9   some social media postings and communications from the

10  ALU that I'd like him to authenticate.  Some of which we

11  have discussed with other witnesses, have not introduced

12  into evidence with other witnesses because they couldn't

13  authenticate certain aspects of some of the

14  communications. And so, I wanted to do that with Mr.

15  Spence since he's represented as sort of the ALU's

16  custodian of records for purposes of this case. And so

17  I'd ask him to authenticate certain communications on

18  that basis.

19          HEARING OFFICER DUNN:  Okay. I'll give you

20  leeway to do that. And of course, the parties are free

21  to make the objections that they make. If the exhibits

22  have been offered previously.  Are any of them rejected

23  already?

24          MR. LARKIN:  I don't believe that there are

25  any rejected exhibits.

 1          HEARING OFFICER DUNN:  So I would request

 2    that if you are going to offer any rejected exhibits,

 3    please tell me that off the bat.

 4          MR. LARKIN:  I'm just looking through my

 5    list right now just to.

 6          MR. MILNER:  Mr. Larkin, I did not get that

 7    in e-mail this morning with exhibits and the usual daily

 8    e-mail.

 9          MR. LARKIN:  Oh, that should be up or going

10    up as we speak. So can you take another look? And if

11    it's not there, we can wait to begin until that, but it

12    should be up.

13          MR. MILNER: Let me see. I don't have an

14    e-mail, but I'll try yesterday's link and see if that

15    works.

16          HEARING OFFICER DUNN:  That works, Mr.

17    Milner.

18          MR. MILNER:  Okay. All right, yeah,

19    yesterday's link seems to get me to today's exhibits,

20    but the folder's empty.

21          MR. LARKIN:  Okay.  So with respect to 16,

22    I'm not certain whether we tried to offer Employer 368

23    before, so I called that one out as one that I was going

24    to ask him about. I don't have a listing that we either

25    did or didn't offer it yet, but for some reason, I sort

1   of have it in my mind that maybe it came up.

2                HEARING OFFICER DUNN:  Okay,.

3                MR. LARKIN:  So just sort of noting that as

4   one that I was going to ask him about.

5                HEARING OFFICER DUNN:  All right.  That's

6   fine.

7                MR. LARKIN:  Okay.  So then with respect to

8   Objections where -- so I guess those are the cumulative

9   ones. With respect to the remainder on Objection 20, Mr.

10  Spence produced some videos of the light projections

11  that I gather are his.  So I would ask him about those,

12  and then I would ask him, again, to authenticate some

13  ALU social media related to that event.

14               HEARING OFFICER DUNN:  Okay.  That should be

15  fine, but just as a caveat, let's not go into the method

16  of how the projection is done. Let's focus on the first

17  hand observation of Mr. Spence.

18               MR. LARKIN:  Okay.  Let's see. With respect

19  to Objection 17, I would ask him about some text

20  messages that we contend the Union sent to eligible

21  voters, and the text messages asked voters how they

22  intend to vote. So we believe that they are sort of

23  supportive of the allegations in 17, so I would ask him

24  to authenticate those, and I may ask some related

25  questions about who wrote -- who created them, and the

1  extent of the distribution of those messages to the

2  bargaining unit.

3          HEARING OFFICER DUNN:  Okay.

4          MR. LARKIN:  All right.  Let's see. On

5  Objection 18, the Union issued some communications, some

6  campaign communications, flyers and things that Mr.

7  Spence -- some of which he produced, I think some of

8  which we may already have had, and so I would ask him to

9  authenticate those.

10          MR. MILNER: Mr. Larkin, I don't want to

11  interrupt you, but that folder for today is still empty

12  there's no exhibits in it.

13          HEARING OFFICER DUNN: In Egnyte?

14          MR. MILNER:  Right.

15          MR. LARKIN:  Okay. I'm almost done with my

16  offers of proof.

17          MR. MILNER: I didn't know if you had someone

18  else working on it. I just didn't want you to --

19          MR. LARKIN:  Should be. I'm checking now.

20  Yeah, it should be going up.

21          MR. MILNER: Okay.

22          MR. LARKIN: Okay.  So yeah, I was on 18.  So

23  I would ask Mr. Spence about some flyers that were

24  produced. I relate to the allegations in Objection 18.

25          HEARING OFFICER DUNN: Okay.

1          MR. LARKIN:  With respect to Objections 3 to

2     5, I have questions for Mr. Spence regarding any

3     conversations that he had between and among himself and

4     the other officers of the ALU regarding the ALU's

5     petition and card submission, any efforts the Union made

6     to continue to submit authorization cards after December

7     22nd of 2021. Conversations that the officers of the

8     Union may have had regarding the level of interest that

9     they believe that they had, and also some

10    communications, external communications, by the Union

11    regarding that subject -- those subjects.

12         HEARING OFFICER DUNN:  So I am not going to

13    permit that line of questioning with respect to

14    Objections 3 through 5, as the showing of interest is a

15    purely administrative manner, not subject to Board

16    litigation. If you have particular exhibits that you

17    would like to show, I'm willing to look at them and

18    allow the parties to weigh in at this time.

19         MR. LARKIN:  Sure. Well, before I do, have

20    the documents loaded?

21         MR. MILNER:  Let me take a look.

22         MS. FRIEDHEIM-WEIS:  They just did.

23         MR. LARKIN:  They should be.

24         MR. MILNER:  Yes.  They're here now.

25         MR. LARKIN:  Okay. So I think the first one

1  that we would offer is 176.  So Molly, can we bring that
2  one up? So 176 is a newsletter submitted by the Union --
3  or it's the ALU newsletter. This one was published on
4  January 26th -- I'm sorry, January 25, 2022. It's the
5  day before the Region 29 indicated to the parties that
6  the Union's petition was supported by a sufficient
7  showing of interest. On page -- I think -- not this
8  page, but the next one, maybe? Or the one after. The one
9  after. Page 3. Sorry. Page 4. Keep going. Yeah, right
10 there. And it's a little bit obscured. I'm not sure why
11 it printed that way, but it's the paragraph of text that
12 says, "although nearly 2000 Amazon workers are on leave
13 in Staten Island due to the pandemic, we also continue
14 to set up in front of JFK8 and gather signatures from
15 the workers every day as the election hearing deadline
16 approaches." And we would offer that as an admission
17 from the Union regarding their card collecting efforts
18 and that that supports Objection 4.
19            HEARING OFFICER DUNN:  Mr. Milner?
20            MR. MILNER:  Your Honor, this exhibit is
21 completely irrelevant. Whether or not they collected
22 signatures after they submitted the petition is
23 irrelevant to whether or not the showing of interest
24 determination was sufficient. It is purely an
25 administrative manner and it is non-litigable under any

1    circumstances. I should also point out, just because the

2    table was set up in front of JFK8, as Amazon well knows,

3    there was other organizing drives going on in the other

4    buildings at the same facility. So it's not even

5    necessarily just JFK8 that cards were being signed for.

6              HEARING OFFICER DUNN:  Ms. Weis.

7              MS. FRIEDHEIM- WEIS:  I echo what Mr. Milner

8    said. And as I've said several times before, and Madam

9    Hearing Officer has ruled several times before, the

10   showing of interest is purely administrative, controlled

11   by the Region, not by who's soliciting for whatever

12   signatures they may be soliciting for. The words

13   themselves that Mr. Larkin refers to, as Mr. Milner

14   pointed out, are vague. We have no idea what signatures

15   are being discussed in this article, but most

16   importantly, the showing of interest is determined by

17   the Region, not by anyone else, and it's not litigable.

18             HEARING OFFICER DUNN:  I find employers 176

19   to be irrelevant on the grounds that the showing of

20   interest is a purely administrative matter, not subject

21   to any litigation. Also, I find that many pages of this

22   document are difficult to read and are not even

23   applicable to this particular petition at JFK8. And

24   therefore, I reject Employer 176.

25             MR. LARKIN: Ask that 176 be placed in the

1   rejected Exhibits file.

2             HEARING OFFICER DUNN: That's granted.

3   (Employer's Exhibit 176 received in rejected exhibits

4   file)

5             MR. LARKIN:  All right. We can take that

6   off. And then Exhibit 2919. 2919 is a communication by

7   the ALU that was disseminated among the bargaining unit

8   after the NLRB indicated -- or specifically Region 9 of

9   the NLRB indicated on January 26 of 2022 that the

10  petition would be allowed to proceed. As we indicated in

11  our Objections, the handling of the petition by the

12  region lent an air of legitimacy to the ALU and its

13  campaign that, had the Region process the petition in

14  accordance with its rules, wouldn't have happened. So I

15  would question Mr. Spence about this document and offer

16  it in support of Objection 3 and 4.

17            HEARING OFFICER DUNN: Mr. Larkin, just to

18  clarify the record, you said Region 9, I think you meant

19  Region 29.

20            MR. LARKIN:  Yes, I did. Thank you.

21            HEARING OFFICER DUNN:  No problem. Mr.

22  Milner?

23            MR. MILNER:  Frankly, your Honor, even if

24  what Mr. Larkin said was true, which we deny, I'm not

25  sure how this pamphlet or flyer would go towards proving

1    that in any way, shape, or form. This is -- simply just

2    seems to be a statement of fact and nothing more. It is

3    wholly irrelevant, and it relates to a non-litigable

4    matter and should also be excluded on that basis.

5              HEARING OFFICER DUNN: Ms. Weis?

6              MS. FRIEDHEIM- WEIS:  Showing of interest is

7    a purely administrative matter, and it's not litigable.

8              HEARING OFFICER DUNN:  Okay.  So I'm going

9    to grant both Mr. Milner and Ms. Weis standing

10   objections on the basis of showing of interest is non

11   litigable, purely administrative matter, and objecting

12   to any documents on that basis as irrelevant. With

13   respect to 2919, I make the same ruling that 2919 is

14   irrelevant to Objections 3 and 4, on the same basis that

15   showing of interest is non-litigable.

16             MR. LARKIN:  Okay. We would ask that 2919 be

17   placed in the rejected exhibits file.

18             HEARING OFFICER DUNN:  That's granted.

19   (Employer's Exhibit 2919 received in rejected exhibits

20   file)

21             MR. LARKIN:  And I believe that is

22   everything in terms of proffer.

23             HEARING OFFICER DUNN:  Okay. Fantastic. Ms.

24   Mirer, if the witness is ready to go into the witness

25   room. That would be great.

1           MS. MIRER:  I'll tell him.

2           HEARING OFFICER DUNN:    Thank you.

3           MR. MILNER:  Mr. Spence is just in the

4    restroom. I just need a couple minutes.

5           HEARING OFFICER DUNN: No problem. Let's

6    briefly go off the record.

7               (Off the record)

8               (On the record).

9           HEARING OFFICER DUNN:  Let's go back on the

10   record, Mr. Larkin. Go ahead.

11          MR. LARKIN:  Yeah.  I'm sorry. Just before I

12   do, I just point out I noticed there's someone in the

13   chat with the name of D Smalls. I just wanted to

14   identify who that was.

15          HEARING OFFICER DUNN:  Okay.  Let's do that

16   briefly, off the record.

17              (Off the record)

18              (On the record)

19          HEARING OFFICER DUNN:  All right.  Go ahead,

20   Mr. Larkin, and let's restart with your proffer.

21          MR. LARKIN:  Yes. So I had one other proffer

22   to make On Objection 21. I would ask Mr. Spence in his

23   capacity as the ALU's custodian of records about filings

24   made by the ALU with the Department of Labor during the

25   critical period.

1          HEARING OFFICER DUNN:  Okay. And I would

2     also reject that testimony on the basis that LMRDA is

3     not properly before the Board and is not something that

4     I'm going to receive evidence for purposes of this

5     hearing.

6          MR. LARKIN:  On that basis, I would proffer

7     that the ALU did not make any filings with the US

8     Department of Labor during the critical period. We would

9     offer 726. Molly, do you have that? 726 is the Amazon

10    Labor Union's Form LM1 filed with the Department of

11    Labor, signed by Mr. Spence as the Secretary Treasurer

12    of the Union, and it was submitted to the Department of

13    Labor after the critical period. Again, our contention

14    and Objection 21, not so much that the ALU violated the

15    LMRDA, so much as it is that the ALU's failure to file

16    forms required of a labor organization under the LMRDA

17    deprived employees of access to information about the

18    Union's operations, finances, and dues structure during

19    the critical period.

20         HEARING OFFICER DUNN:  Mr. Milner.

21         MR. MILNER: Hearing Officer Dunn, as we've

22    argued on multiple occasions, the NLRB is not the

23    appropriate forum to litigate issues related to the

24    LMRDA. And Amazon's attempt to cast this as anything

25    else is just a backwards way of trying to get the same

1  evidence into the record. Whether or not they filed the

2  LMRDA is simply not relevant to an objections

3  proceeding.

4          HEARING OFFICER DUNN:  Ms. Milner -- I'm

5  sorry, Ms. Weis?

6          MS. FRIEDHEIM- WEIS:  The Rd rep takes no

7  position regarding the filing of an LM1.

8          HEARING OFFICER DUNN:  Okay.  So I find

9  Employer 726 to be irrelevant. As I've stated already,

10  that the NLRB is not the appropriate forum for any

11  issues pertaining to the LMRDA.

12          MR. MILNER:  Your Honor, I just want to put

13  on the record Angelika Maldonado, I believe, is now

14  logged in as our alternate observer.

15          HEARING OFFICER DUNN:  Thank you.

16          MR. LARKIN:  So I'd request that Exhibit 726

17  be placed in the rejected exhibits file.

18          HEARING OFFICER DUNN: That's granted.

19  (Employer's Exhibit 726 received in rejected exhibits

20  file)

21          MR. LARKIN:  All right.  Let me see.

22          MR. MILNER:  Also, it's too late now, but I

23  just realized at the last second there was phone numbers

24  listed on that LM form. So just -- to do that, Can we be

25  careful? We're going to post those publicly.

1          HEARING OFFICER DUNN:  Yes.  Mr. Larkin, to

2    the extent that there are telephone numbers even for the

3    rejected exhibit file, please redact any addresses,

4    telephone numbers, identifiable information on any

5    exhibits that you're going to put into the record,

6    including the rejected exhibits file.

7          MR. LARKIN:  All right.

8          HEARING OFFICER DUNN:  Thank you.

9          MR. LARKIN:  Just making a note. I would

10   just then offer 727 as well. Do you have it, Molly? It's

11   an updated version of the ALU's constitution and bylaws.

12   The original version, which is Exhibit 298, is already

13   admitted in the record. This version of the constitution

14   and bylaws, I believe, was attached to the Union's. LM

15   one filing Employers Exhibit 726, so we would offer it

16   as an attachment to 726.

17          HEARING OFFICER DUNN:  Do you know, Mr.

18   Larkin -- you said it was attached to the 726. As I read

19   the last exhibit, 726, I believe it was dated of June in

20   '22. Do you know what period this constitution and

21   bylaws was in effect At 727.

22          MR. LARKIN:  Well, I do not. I was going to

23   question Mr. Spence about when 727 came into effect.

24          HEARING OFFICER DUNN:  And is it different?

25   I forget the exhibit number, Mr. Larkin. Of the

1   constitution and by law, that's already in. Is it

2   somehow different or does it appear to be identical? Do

3   you know Mr. Larkin?

4           MR. LARKIN:  There are some differences

5   between the two. There were some changes made. Renaming

6   of certain things, removal of certain rules, addition of

7   certain rules.

8           HEARING OFFICER DUNN:  Okay.  Mr. Milner?

9           MR. MILNER:  Well, I mean, he should

10  probably question the witness about it before he offers

11  it, and then I'll reserve my objections for that time.

12          HEARING OFFICER DUNN:  Okay.

13          MR. MILNER:  But I don't think it's going to

14  be relevant. But we'll wait to hear what the witness

15  says.

16          HEARING OFFICER DUNN:  That's my inclination

17  as well, Ms. Weis.

18          MS. FRIEDHEIM- WEIS: I have no problem with

19  that because I have no idea what the date is. If it's

20  beyond the critical period, I would object because it's

21  beyond the date of the critical period, but without

22  knowing what the witness is going to say, it's hard to

23  tell.

24          HEARING OFFICER DUNN:  Yes.  You're

25  permitted to question the witness on this, Mr. Larkin.

1          MR. LARKIN:  Okay.  We can take that down.

2     So I think that is now everything.

3          HEARING OFFICER DUNN:  Okay.  And it's okay

4     if it's not. If something comes up and you realize that

5     at the time, I've been in your shoes, so I'll give you

6     some leeway because I recognize that that's not an easy

7     position to be in. So we can bring the witness back

8     in -- Oh, Ms. Weis?

9          MS. FRIEDHEIM- WEIS:  Before we make Mr.

10    Spence come in, can we just take two minutes for a

11    restroom break before we get rolling?

12         HEARING OFFICER DUNN: Sure. Off the record.

13    Two minutes.

14              (Off the record)

15              (On the record).

16         HEARING OFFICER DUNN:  Let's go back on the

17    record.  Mr. Larkin, just so we make sure we have it on

18    the record, could the Employer indicate who it intends

19    to cause its next witness.

20         MR. LARKIN:  Yes. We will call Connor

21    Spence.

22         HEARING OFFICER DUNN:  Great. Hello, Mr.

23    Spence.

24         MR. SPENCE:  Morning.

25         HEARING OFFICER DUNN:  You already know that

1    I am the Hearing Officer in this matter. Would you

2    please raise your right hand for me?

3                    (CONNOR SPENCE, after first being duly

4    sworn, was examined and testified as follows...)

5                    HEARING OFFICER DUNN:  All right.  Go ahead

6    and put your hand down. And do you have any materials

7    with you? Such as any documents or cell phone, anything

8    like that?

9                    THE WITNESS:  No.

10                   HEARING OFFICER DUNN:  Okay. And is anyone

11   present with you in that room?

12                   THE WITNESS:  No.

13                   HEARING OFFICER DUNN: All right. And I will

14   turn it over to Mr. Larkin. Go ahead.

15   DIRECT EXAMINATION BY MR. LARKIN:^ questioning begins

16       Q.  Thank you. Good morning, Mr. Spence.

17       A.  Good morning.

18       Q.  Mr. Spence, who is your Employer?

19       A.  Amazon.

20       Q.  And where in Amazon do you work at?

21       A.  JFK8 in Staten Island.

22       Q.  Okay. And how long have you been employed there?

23       A.  Since May of 2021, and I've been employed at

24   other Amazon warehouses in the past.

25       Q.  Okay. When did you start your employment with

1 Amazon?

2 A. In, I believe, August of 2017.

3 Q. Okay. And where did you start? What facility did

4 you begin working at Amazon?

5 A. A building called EWR4 in Robinsville, New

6 Jersey.

7 Q. How long were you there?

8 A. Between 2017 and the end of 2019 is when I left.

9 Q. Okay. And then when you left EWR4 at the end of

10 2019, where did you go?

11 A. I had a different job.

12 Q. I see. So you left Amazon altogether?

13 A. Yeah.

14 Q. And at some point, did you return to employment

15 with Amazon?

16 A. Yes.

17 Q. Was that in May of '21?

18 A. Yes.

19 Q. Got it. And have you worked at JFK8 continuously

20 since May of '21?

21 A. Yes.

22 Q. And what is your position at JFK8?

23 A. I'm a tier one associate.

24 Q. And what's your work shift?

25 A. Sunday to Wednesday, 7:15 am. To 5:45 p.m.

1    Sometimes called front half.

2         Q.   Okay. So you're front half days?

3         A.   Yes.

4         Q.   All right. And have you held that shift the

5    entire time you've been at JFK8?

6         A.   Yes.

7         Q.   All right. So Mr. Spence, we're going to be

8    obviously talking today about the ALU election, the

9    petition filed in the case. And I know you've been

10   present for a lot of this, but just to, sort of,

11   establish kind of the same definitions and ground rules,

12   et cetera, as we talk today, if I refer to the ALU or

13   the Union, when I say that, I mean the Amazon Labor

14   Union, okay?  And I might ask you questions about time

15   periods that things happened. And as with some of our

16   prior witnesses when I used the word -- the term

17   campaign period, what I mean is from the day the Union

18   filed a petition on December 22nd of 2021 until the last

19   day of the election, March 30th of 2022. All right?

20        A.   Okay.

21        Q.   And I may ask you about things that pertain to a

22   different time period, but if I do, I will be clear

23   about that in the question.  And if I'm not, please let

24   me know. As you've seen as we've gone through this,

25   sometimes I need to ask better questions. So Mr. Spence,

    1  during the campaign period, what, if any, position did

    2  you hold with the Amazon Labor Union?

    3     A.  During the critical period I was the vice

    4  president of membership.

    5     Q.  Okay. And also, just again, so the record is

    6  clear when you say the critical period or if I say the

    7  critical period --

    8     A.  I mean December 22nd to March 30th.

    9     Q.  Okay. So we can use critical period and campaign

   10  period interchangeably, and we'll know what we're

   11  talking about.

   12     A.  Yeah.  Sorry about that.

   13     Q.  That's fine. Okay.  So you were the vice

   14  president of membership during the critical period. Did

   15  you hold that position for the entire critical period?

   16     A.  Yes.

   17     Q.  All right. And what were your responsibilities in

   18  that position?

   19     A.  So the way we've outlined that role in our

   20  constitution, our Union makes a distinction between

   21  internal organizing and external organizing. Internal

   22  organizing is organizing the membership that already

   23  exists within the Union, and external organizing is

   24  organizing the unorganized people out there in the

   25  world. However, at that point, because JFK8 was our

1    first campaign, it was essentially a role that was

2    overseeing all of our organizing activities, for the

3    most part, which is a role that I shared with other

4    officers in the Union.

5        Q.  Okay. And when did you assume that position?

6        A.  In October of 2021.

7        Q.  And do you continue to serve in that position?

8        A.  No. We've since changed some of our leadership

9    roles. I currently serve as the secretary treasurer.

10       Q.  When did you stop serving as vice president of

11   membership?

12       A.  It was after the campaign period.

13       Q.  Of course you've been serving also as the ALU's

14   party representative during this case, is that correct?

15       A.  Yes.

16       Q.  All right. Before I, sort of, get into asking you

17   about documents and things -- and you've seen how we've

18   done that, so we'll do it the same way. I'll put a

19   document on the screen. I'll ask you to look at it and

20   see if you recognize it, and if you do, we might talk

21   about it. But before I do that, Mr. Spence, did you

22   receive a subpoena to produce documents in this case?

23       A.  Yes.

24       Q.  And you did, pursuant to that subpoena, provide

25   some documents, is that right?

1    A.  Yes.

2    Q.  And can you tell us what you did to search for

3   responsive documents?

4    A.  So depending on the request, if it was something

5   like our constitution and bylaws if I had that, I

6   provided it. If it was asking me to search for things

7   like documents or communications, I looked on my

8   devices, and I used the search function on each of my

9   devices to look for keywords related to whatever was in

10  the subpoena.

11   Q.  And do you know when you began your search for

12  responsive documents?

13   A.  Over the course of the last few weeks.

14   Q.  Did you talk to anyone else about what to search

15  for or what you were searching for?

16        MR. MILNER:  Objection to anything that goes

17  to privilege.

18        HEARING OFFICER DUNN:  Yes. Mr. Spence,

19  please don't reveal any legal advice given by the ALU

20  attorneys to you.

21  BY MR. LARKIN:

22   Q.  Yeah.  Actually, let me back up and outline that

23  so we don't go there. Mr. Spence, are you represented by

24  any of the ALU's attorneys for purposes of this hearing?

25   A.  Yes.

1    Q.  And which ones?

2    A.  Jeanne Mirer, Eric Milner, Retu Singla.

3    Q.  Okay.

4    A.  And Seth Goldstein. I don't know if he's on the

5    call as well.

6    Q.  Okay. Now, do they represent you in your

7    individual capacity or in your capacity as an ALU

8    officer?

9    A.  My capacity as an officer.

10   Q.  Now, in searching for documents to produce in

11   response to the subpoena, did you talk with anybody

12   besides your lawyers?

13   A.  No.

14   Q.  Now, we've been, sort of, talking about a

15   subpoena that was directed to you individually, but

16   you're also aware that there is a subpoena directed to

17   the Amazon Labor Union's custodian of records, correct?

18   A.  Yes.

19   Q.  And that is you?

20   A.  For the most part. A lot of the requests on the

21   custodian of records subpoena was covered by a lot of

22   the other subpoenas that were sent out. So I just gave

23   what I had from that subpoena.

24   Q.  Is there anybody besides you who would be in

25   possession of records that you would consider records of

1    the Amazon Labor Union?

2       A.  No. Like I said, if there was something on the

3    custodian records subpoena that I didn't have, it's

4    likely on someone else's subpoena.

5       Q.  Does the ALU have -- trying to word this

6    correctly -- but any sort of organizational

7    communication channels. So for instance, if you have an

8    e-mail address as an employee of Amazon or any company

9    that is not your personal e-mail address, but it's your

10   work e-mail address, does the ALU have any sort of

11   communication or e-mail communication system like that?

12              MR. MILNER:  I object. I don't know what the

13   relevance is whether or not the Amazon Labor Union has

14   e-mailed.

15              HEARING OFFICER DUNN:  Mr. Larkin, where are

16   we going?

17              MR. LARKIN:  Well, it goes to subpoena and

18   the efforts made to comply.

19              MR. MILNER:  Well, I mean, you can ask him

20   if he searched e-mail. I don't know why it's relevant,

21   what e-mail he may or may not have.

22              HEARING OFFICER DUNN:  Mr. Larkin are you

23   asking if he has ALU e-mail? Is that what you're asking?

24              MR. LARKIN:  Yeah.

25              HEARING OFFICER DUNN:  Mr. Spence.

1    BY MR. LARKIN:

2        A.  Yes.

3        Q.  So was your answer to my question, yes?

4        A.  It was the answer to the question, do I have an

5    ALU e-mail, yes.

6        Q.  Okay.  And is that something that you searched

7    for communications relevant to the subpoena?

8        A.  Yes.

9        Q.  And you found none?

10       A.  I didn't find anything that wasn't protected by

11   Section 7.

12       Q.  What does that mean?

13       A.  Essentially communications with coworkers that

14   would have revealed their Union sentiment, organizing

15   activities. There was nothing there that was responsive

16   to the request in the subpoena.

17       Q.  Just to make sure I understand, so are you saying

18   that there were communications that were otherwise

19   responsive but that reflected Section 7 activity, or

20   that there were communications that reflected Section 7

21   activity but were not otherwise responsive?

22           MR. MILNER:  Well, I'm going to object to

23   that question because it doesn't make sense. If it

24   reveals Section 7 activity, then it was excluded by the

25   request and therefore it is not responsive. So the

1   question itself doesn't really have an answer. It

2   doesn't make sense.

3           HEARING OFFICER DUNN:  Mr. Larkin, can you

4   rephrase the question?

5   BY MR. LARKIN:

6   Q.  Yeah, I was not trying to ask it in a confusing

7   way, but I know sometimes I do.  I guess -- Mr. Spence,

8   I was just trying to understand your answer, and you had

9   said there were e-mails on your ALU e-mail account that

10  you found, but that they reflected Section 7 activity.

11  So I guess the better way to ask the question is, were

12  any of those e-mails otherwise responsive to anything in

13  the subpoena?

14  A.  I think a better answer for me is that I searched

15  my e-mails for things that were responsive to the

16  subpoena, but I excluded even really looking at things

17  that were covered by Section 7 and I just looked at what

18  I had and there was nothing there that ended up being

19  responsive for the subpoena.

20  Q.  Okay.  I understand now.  Did the ALU communicate

21  by Telegram during the campaign period?

22  A.  Yes.

23  Q.  And is that something that you still have access

24  to?

25  A.  No.

1    Q.  Tell me a little bit about how access to Telegram

2  works?

3            MR. MILNER:  Objection. To the extent the

4  witness knows, obviously.

5            HEARING OFFICER DUNN:  Yes. And I was going

6  to tell you, Mr. Spence, no one expects you to be an

7  expert on Telegram, so just testify based on your own

8  personal knowledge.

9  BY MR. LARKIN:

10   A.  Yeah. Okay. So to answer the question, Telegram

11 is a group messaging app that you could use on a mobile

12 phone, and it was something that we use to communicate

13 throughout the campaign.

14   Q.  And when you say you no longer have access to it,

15 why is that?

16   A.  It was deleted after the campaign.

17   Q.  Do you recall -- well, when you say "it" -- when

18 you say "it," do you mean what do you mean by "it?"

19   A.  Sorry. The group channel in Telegram that we were

20 using to communicate through was deleted.

21   Q.  Okay. Do you remember when?

22   A.  It was shortly after the campaign ended.

23 Sometime in early April.

24   Q.  April of 2022?

25   A.  Yes.

1      Q.  Do you know who deleted the channel?

2              MR. MILNER:  Objection. It's irrelevant.

3              HEARING OFFICER DUNN:  Yeah. Mr. Larkin, I

4      don't think that's relevant.

5      BY MR. LARKIN:

6      Q.  Okay. So after the deletion of the Telegram

7      channel, I guess, is it your testimony that no one has

8      access to any of the communications that had taken place

9      prior to the time that the channel was deleted?

10     A.  Yeah. So one of the features of Telegram that

11     makes it a secure communications app is that once

12     messages are deleted by one party, they're deleted by

13     everybody -- for everybody.

14     Q.  In responding, Mr. Spence, to the subpoena to you

15     personally and then in gathering communications to

16     respond to the subpoena to the Amazon Labor Union, did

17     you delete any communications that would have been

18     relevant to the requests after you received the

19     subpoena?

20     A.  I don't recall what was in the Telegram.

21     Q.  Well, this is not so much the Telegram because I

22     know you said that the Telegram was -- the whole thing

23     was deleted in April of '22. I'm speaking, sort of,

24     universally about communications that may have been in

25     your possession or the Union's possession that would

1  have been relevant to the subpoenas?

2      A.  To my knowledge, I hadn't deleted anything else.

3  Whatever was responsive, is what I gave over.

4      Q.  Okay. And then, just one other question on the

5  ALU e-mail. If you know, is there a standard retention

6  rule in place for your ALU e-mail? So as an example,

7  some employers have a limit on what can be in your

8  inbox, and after a certain amount of time, things are

9  automatically deleted whether you manually delete them

10  or not. So the question is, does the ALU's e-mail system

11  have any sort of rules in place like that that address

12  the retention of communications?

13      A.  Not as far as I know.

14      Q.  Did the Union communicate during the campaign

15  period by Slack?

16      A.  Yes.

17      Q.  And do you still have access to those

18  communications?

19      A.  Yes.

20      Q.  Did you search those in your search for

21  responsive material?

22      A.  Yes. During the critical period, there was

23  nothing responsive in the Slack Because at that time, we

24  were mainly using the Telegram.

25      Q.  I see. So Slack is something that you've used

1   more frequently after the campaign period?

2      A.  Yes.

3      Q.  All right. Okay. I want to ask you a couple of

4   questions about some of the Union's governing documents.

5   So let me start by putting up Exhibit 298. So Mr.

6   Spence, this document that's already admitted in

7   evidence, it's Employer 298, and I'll represent it, it's

8   a 27-page document that's the ALU's Constitution and

9   bylaws as of 2021, do you recognize Exhibit 298?

10      A.  I recognize the first page.

11      Q.  Okay.  Well, let me ask you this, and if we need

12   to, sort of, scroll through this, we're happy to do it

13   so that you can take a look at it. Generally, when did

14   the ALU adopt its constitution and bylaws?

15          MR. MILNER:  Objection. What's the relevance

16   of when they adopted their constitution and bylaws? Are

17   we just talking about the critical period here.

18          MR. LARKIN:  Well, what I'm trying to get to

19   is what we talked about before Mr. Spence came into the

20   room with respect to Exhibit 727. And so I just want to

21   establish the time period that the 298 was adopted and

22   in place.

23          HEARING OFFICER DUNN:  I'll give you some

24   leeway. Go ahead.

25   BY MR. LARKIN:

1    Q.  Yeah. So Mr. Spence, the question was, when did

2    the ALU adopt its constitution and bylaws?

3    A.  In October of 2021 it was ratified.

4    Q.  Okay. And after the ALU adopted its constitution

5    -- or ratified its constitution and bylaws, in October

6    of '21, did it publish any amendments or changes to the

7    constitution at any point after that?

8    A.  It was revised on one or more occasions. I don't

9    recall how many times. But there were revisions after

10   its initial ratification.

11    Q.  Okay.  And you don't recall how many revisions?

12    A.  No.

13    Q.  Were any of those revisions during the campaign

14  period?

15    A.  I don't believe so.

16    Q.  Okay. Now, Mr. Spence, you recall making a filing

17  with the Department of Labor late last month where you

18  filed an LM1 on behalf of the ALU?

19         MR. MILNER:  Objection.

20         HEARING OFFICER DUNN:  I think the next

21  question is going to be about what was attached to it.

22  Is that correct, Mr. Larkin?

23         MR. LARKIN:  Yes.

24         HEARING OFFICER DUNN:  Okay.  So I'll permit

25  you to ask your next question.

1    BY MR. LARKIN:

2         Q.  Yeah. And did you attach a copy of the ALU's

3    CONSTITUTION to your LM1 filing?

4         A.  Yes.

5         Q.  Okay.  And my question to you is, when did the

6    version of the constitution that you attached to the

7    ALU's LM1 filing get adopted by the Union?

8         A.  After the campaign period.

9         Q.  All right.  We can take that down, Molly?

10                  HEARING OFFICER DUNN:  Can I ask a question,

11   please?

12                  MR. LARKIN: Sure.

13                  HEARING OFFICER DUNN:  Could you put it back

14   up, please, Ms. Hanratty? So to your knowledge, Mr.

15   Spence, was Employer 298, the Amazon Labor Union

16   constitution and bylaws dated 2021, the applicable

17   version of the constitution and bylaws during the

18   critical period.

19                  THE WITNESS:  Well, I'd have to see all the

20   pages if we could.

21                  HEARING OFFICER DUNN:  Yes, please.

22                  MR. LARKIN:  So can we go ahead, Molly, and

23   just sort of scroll slowly through.  If you need us to

24   slow down or speed up, Mr. Spence to say so.

25                  THE WITNESS:  Okay. Yeah.

```
 1              HEARING OFFICER DUNN:  Okay. And there was

 2   no signature page, is that right?

 3              THE WITNESS:  That's right.

 4              HEARING OFFICER DUNN:  Okay. Mr. Larkin?

 5   BY MR. LARKIN:

 6     Q.  Okay. So we can take it down. Okay. So Mr.

 7   Spence, during the critical period, who were the ALU's

 8   officers?

 9     A.  The president was Chris Smalls. I was the vice

10   president of membership. Derek Palmer was the vice

11   president of organizing. Madeline Wesley was the

12   treasurer, and Karen Ponce was the secretary.

13     Q.  Did Gerald Bryson hold any position in the Union

14   during the campaign period?

15     A.  No.

16     Q.  Is there a position in the Union that you refer

17   to as sergeant at arms?

18     A.  Not during the campaign period.

19     Q.  What is the sergeant at arms position?

20     A.  Yeah. So I'll say even now, it's more of an

21   honorific. It's not a title that is in our constitution

22   or a position that you're elected toward. It's more of a

23   recognition of his contributions as a wrongfully

24   terminated worker organizer.

25     Q.  So sort of like an honorary position?
```

1    A.  Yeah. Doesn't confer any authority.

2    Q.  Okay. When was that, sort of, honorary title

3  conferred on Mr. Bryson?

4    A.  After the election period.

5    Q.  After the election in March of '22?

6    A.  Yes.

7    Q.  All right. Does Jordan Flowers hold any position

8  with the Union?

9    A.  To my knowledge, no.

10    Q.  Is he an organizer with the Union?

11    A.  Yes.

12    Q.  Does the Union have an executive board?

13    A.  Yes.

14    Q.  And who serves on the executive board?  Not

15  people, just what --

16    A.  Position?

17    Q.  Yeah.

18    A.  Okay. So the Executive Officer position that I

19  just listed, the president, two vice presidents, the

20  treasurer, the secretary, and each building or workforce

21  that we organize within has their own organizing

22  committee or worker committee or steward committee. And

23  that committee has elected chairperson. That chairperson

24  also serves as a member of the executive board.  And

25  that's how it was during the campaign period.

```
 1    Q.  Okay. So the chairperson of the steward committee
 2  is also a member of the executive board?
 3    A.  Yeah. The terms organizing committee, worker
 4  committee, steward committee. I use those
 5  interchangeably. We could just say organizing committee
 6  because that's what we had in JFK8.
 7    Q.  Okay. So for JFK8 during the campaign period, the
 8  Union had one committee, not several?
 9    A.  Yeah.
10    Q.  Okay. And if we call it the Organizing Committee
11  or the Workers Committee, it's essentially the same
12  thing?
13    A.  Yeah.
14    Q.  Who was the chair of the steward committee during
15  the campaign period?
16    A.  It was Angelika Maldonado.
17    Q.  Okay. And does any other person serve on the
18  executive Board?
19    A.  I don't know if you want me to say the name, but
20  there's a director of organizing, a role that the
21  executive board created to assist with organizing
22  efforts during the campaign.
23    Q.  And who was that during the campaign?
24    A.  It was Brett Daniels.
25    Q.  Okay. Any other person who would serve on the
```

executive committee besides the seven that you've listed

so far?

A. No. There is a committee chairperson for LDJ5.

Q. Who was that?

A. I actually don't think there was one during the

campaign period.

Q. Okay.

A. They were elected after.

Q. With respect to the workers committee, what is

the role of the workers committee?

A. The workers committee or the organizing committee

is essentially a body of workers that is open to anybody

who wants to organize on behalf of the Union and spread

like a pro-union message. Get their co workers on Board,

give them information, get authorization cards signed,

campaign for yes votes, things like that.

Q. Does their role include discussing and voting on

collective bargaining policy and strategy?

MR. MILNER: I'm going to object, and maybe

we should excuse the witness before I start getting into

my objection.

HEARING OFFICER DUNN: Mr. Spence, if you'd

be so kind to leave that room while the attorneys

discuss this. I appreciate it. And then, Mr. Milner, if

you could just let us know once we're safe to discuss.

1    (Witness leaves videoconference)

2    MR. MILNER:  Sure. Let me. Okay.

3    HEARING OFFICER DUNN:  Go ahead, Mr. Milner.

4    MR. MILNER:  Sure. Got To gather my

5 thoughts. Again.  I'm not sure. First of all, we have

6 stipulated through the agency status of Angelika

7 Maldonado and Brett Daniels, and there's now testimony

8 that those were the only executive board members from

9 this workers committee. So I'm not sure what the

10 relevance is of any further questions regarding the

11 workers committee is at that point.

12    HEARING OFFICER DUNN: I'm not either. Mr.

13 Larkin.

14    MR. LARKIN:  Well, there are a number of

15 individuals that the upon has not stipulated to as

16 agents, and some of whom have testified, some of whom

17 have not. So I think that it is probative to ask Mr.

18 Spence questions about how these various committees

19 operated, who was on them, and what their authority was.

20 These questions are not focused on the people that he's

21 named.

22    MR. MILNER:  I mean, being a member of a

23 workers committee does not make one an agent, not even

24 close, not by any construction of the facts. I mean, it

25 is by its nature you're not an agent. You're in the

1 workers committee. You're a worker at Amazon, and you

2 want to volunteer for the Union. There's no agency

3 status that you're going to this is just absolutely

4 irrelevant testimony.

5          MR. LARKIN:  That's a legal argument. It's

6 not a basis on which not to elicit facts that, when

7 combined with other facts and combined with other facts,

8 and combined with other facts that have been elicited

9 throughout the course of this proceeding, could amount

10 to a finding of agency status.

11          HEARING OFFICER DUNN:  Mr. Larkin, you asked

12 about a particular individual by name already. Mr.

13 Flowers, for example, nothing would preclude you from

14 doing something similar regarding other individuals that

15 haven't been stipulated to, if that's what you're

16 seeking with this witness. But I mean, I'm inclined to

17 agree that going into the details of this organizing

18 committee is not going to be relevant to any of the

19 Objections before me or to establishing agency status.

20          MR. LARKIN:  Well, I would just say that the

21 CONSTITUTION grants specific powers to the committee,

22 and it's all in 298. And so, part of what I'm asking Mr.

23 Spence about is to confirm or deny that and to ask him

24 about how those powers were carried out during the

25 campaign period by the members of the workers committee

1   and whether certain individuals were part of it. So if

2   the constitution confers certain authority on people,

3   our position is that that is probative not in and of

4   itself the be all and end all, but probative of whether

5   in certain situations those individuals were acting on

6   the authority of the ALU and hence acting as agents. And

7   so, Mr. Spence is the ALU's custodian of records, and so

8   I'm asking him these questions in that capacity to sort

9   of generally establish these things.

10          HEARING OFFICER DUNN:  Okay.  So the

11  constitution and bylaws at 298 speaks for itself, but

12  I'll give you some leeway. But I don't think that --

13  much.  Because I'm not sure much of that's going to be

14  relevant at this point in the record with the

15  stipulations that have been received regarding agency

16  status.

17          MR. MILNER:  Right. I mean, there's already

18  been testimony that there is a chairperson to this

19  committee and we have stipulated to the agency status of

20  the chair people to the committee. So again, the other

21  people on the committee, that doesn't prove that they're

22  agents. It just proves that they're members of a

23  committee, which there is well established case law that

24  being a member of an organizing committee or bargaining

25  committee does not make you an agent of the Union.

1          HEARING OFFICER DUNN:  Yes.  That's noted,

2     Mr. Milner. And I agree.

3          MR. LARKIN:  I guess I would just note for

4     the record that there are cases where the Board has

5     considered employee's positions on organizing

6     committees, among other things, as probative of a

7     question of whether those individuals were agents of the

8     Union.

9          MR. MILNER: Well, then, I mean, if there's

10    specific people you want to ask questions about, then we

11    can have a different discussion.

12         MR. LARKIN: Well, that's, sort of, what I'm

13    getting to.

14         HEARING OFFICER DUNN:  Okay.  Then that's

15    fine. I mean, we already had you name one individual and

16    ask -- if you want to do something similar, I certainly

17    wouldn't have any issue with that. Let's ask Mr. Spence

18    if he can come back in the room, please.

19         MR. MILNER:  Sure.

20         HEARING OFFICER DUNN:  Thank you.

21         MS. MIRER:  I'll go after him.

22         HEARING OFFICER DUNN:  Thank you, Ms. Mirer.

23         MR. MILNER:  He's coming around the other

24    door.

25         (Witness re-enters videoconference)

1          HEARING OFFICER DUNN:  And just as a

2    reminder, Mr. Larkin, I don't know if at any point in

3    this testimony we're going to be going into other

4    employee's Section 7 activity, but just let me know and

5    we'll go into a breakout room. All right. Mr. Spence,

6    welcome back. I remind you that you remain under oath.

7    And go ahead, Mr. Larkin.

8          MR. LARKIN:  Yeah.  I guess in response to

9    your last comment, Madam Hearing Officer, I don't know

10   whether asking the witness questions about specific

11   people would necessitate going into a breakout room or

12   not. I mean, we've had a lot of testimony about specific

13   individuals and what they did and didn't do, but I do

14   intend to ask about certain people who are, in some

15   cases, bargaining unit members. And so, if it would be

16   more appropriate to do that in a breakout room,

17   certainly don't have any problem with that.

18         HEARING OFFICER DUNN:  Yes, please. Ms.

19   Zellinger, if you could assist us in going into a

20   breakout room, I'd appreciate it.

21         (Enters breakout room).

22         MR. LARKIN:  Or we can just not ask.  Is

23   everybody in here yet?

24         HEARING OFFICER DUNN:  And yes, let's have

25   the Petitioner and have the Employer confirm that

 1    everyone that needs to be present is present before Mr.

 2    Larkin proceeds.

 3            MR. LARKIN:  Yeah, I think we have everyone

 4    from our side.

 5            MR. MILNER:  I see everyone as well.

 6            HEARING OFFICER DUNN:  Perfect. Go ahead,

 7    Mr. Larkin.

 8    BY MR. LARKIN:

 9    Q.  Okay. I think before we broke, we were talking

10    about the workers committee, which I think we've agreed

11    is sort of synonymous with the organizing committee, is

12    that right?

13    A.  Yes.

14    Q.  So if a person was on the workers committee, I

15    guess they're also, for all intents and purposes, on the

16    organizing committee?

17    A.  Yes.

18    Q.  During the campaign period, how many individuals

19    were members of the workers committee?

20    A.  It's hard to nail down a number because anybody

21    who was a vocal supporter could essentially consider

22    themselves an organizer. And so, we didn't have a

23    running count of how many people took that title for

24    themselves. I'd say over 100.

25    Q.  During the campaign period, did the committee

1  have -- hold meetings?

2    A.  Yes.

3    Q.  Do you recall how many?

4    A.  We tried to have weekly meetings.

5    Q.  Okay. Members of this workers committee, they

6  would communicate with bargaining unit members regarding

7  the Union, correct?

8    A.  Yeah.

9        MR. MILNER:  Objection. Again, it's the same

10  objection as before.

11        HEARING OFFICER DUNN:  Yes. Mr. Larkin, I

12  said some leeway and I said not much. So I think we've

13  reached that point.

14  BY MR. LARKIN:

15    Q.  What did the Union do, Mr. Spence, to make sure

16  that the people who, as you say, took the title of

17  organizer for themselves were communicating the Union's

18  campaign messaging in a way that was consistent?

19        HEARING OFFICER DUNN:  Mr. Milner

20        MR. MILNER:  I'm sorry, I do not mean to

21  interrupt. Apparently Mr. Goldstein was not put into the

22  breakout room. I apologize.

23        HEARING OFFICER DUNN:  All right.  I will

24  tell the bailiff.  Sorry about the interruption, go

25  ahead.

1          MR. MILNER: Sorry,  Mr. Larkin.

2    BY MR. LARKIN:

3        Q.   That's all right.  Mr. Spence?

4        A.   Sorry. I was about to say anybody in the building

5    who is pro-Union and supportive of the Union have the

6    right in the workplace to talk about the Union, whether

7    they consider themselves an organizer or not. The best

8    we could do was communicate to these people who were

9    spreading pro-Union messages. What we felt was accurate

10   information about the organizing campaign and the Union

11   we were trying to form, which was something we did by

12   communicating through literature that we handed out

13   through communications, like text messages or e-mails

14   and social media messaging, things of that nature.

15       Q.   Okay.  So these are all things that you

16   disseminated through organizers?

17       A.   Yeah. And any pro-Union worker had access to

18   these communications.

19       Q.   Okay. So one of the campaign themes that the

20   Union -- during the campaign period was asking the

21   company for $30 an hour. Do you recall that?

22           MR. MILNER:   I'm sorry, we have gone into a

23   breakout room because I thought we were going to be

24   talking about individuals, and now we're not. So if

25   that's the case, I would like to go back to the public

1   hearing room.

2              MR. LARKIN:  Well, we're going to talk about

3   individuals.

4              HEARING OFFICER DUNN: Okay.

5              MR. MILNER:  Well, I mean, as long as we're

6   getting there, because otherwise this hearing should

7   remain public.

8              HEARING OFFICER DUNN: Go ahead, Mr. Larkin.

9   BY MR. LARKIN:

10      A.  Can you repeat the question?

11      Q.  Yeah. So one of the Union's campaign themes, I

12   believe, during the campaign period was that the Union

13   was going to demand $30 an hour wage from Amazon. You're

14   familiar with that?

15      A.  Yeah.

16      Q.  That's a message that the ALU created, correct?

17      A.  That was a message that was kind of

18   democratically approved by the organizing committee.

19      Q.  Right. So when that message was conveyed to

20   associates that associates that, you know, we're going

21   to, among other things, ask for $30 an hour, that was

22   conveyed as the position of the Union, not the position

23   of any individual?

24      A.  Yes. Based on surveys from Amazon associates. So

25   it was more a communication of information that we had

1    obtained from our coworkers.

2        Q.  Yes. And then the Union formulated what its

3    position was going to be on that issue, correct?

4        A.  Yeah.

5            MR. MILNER:  I'm going to object again, I'm

6    not sure what relevance the Union's bargaining positions

7    have to the Amazon's Objections. And again, I'm going to

8    ask that we return to the public hearing room If we're

9    not going to be specifically speaking about individuals,

10   we can return to the breakout room at such time.

11           MR. LARKIN  :That's fine.

12           HEARING OFFICER DUNN:  No.  I agree. Well, I

13   mean, unless we can go there right now, can we turn to

14   that testimony and then return to the public room, Mr.

15   Larkin?

16   BY MR. LARKIN:

17       Q.  Well, let me try to speed this up.  Mr. Spence,

18   of the 100 or so members of the workers committee,

19   certain of those numbers were designated lead

20   organizers, is that right?

21       A.  Nobody designated anyone as a lead organizer. It

22   was more of an informal title given by somebody to

23   themselves, essentially when they saw themselves as

24   putting in maybe more work than others and being more

25   vocal than others. And it was just something that was

1   essentially a state of mind.

2       Q.  So for instance, a person like Jason Anthony.

3   You're familiar with Jason Anthony, correct?

4       A.  Yes.

5       Q.  And you know that Jason Anthony held himself out

6   on social media as a lead organizer for the Union?

7       A.  Yes.

8       Q.  And you never told Mr. Anthony that he could not

9   hold himself out in that capacity?

10      A.  I mean, if he considered himself to be a vocal

11  supporter of the Union, then I have no issue with him

12  holding himself out like that.

13      Q.  Okay.  So the answer to my question then was you

14  never told him that he couldn't hold himself out that

15  way?

16      A.  I honestly didn't even know that he was holding

17  himself out that way.

18      Q.  I think I just asked you, you're familiar that

19  Mr. Anthony holding himself out as a lead organizer and

20  you said yes.

21      A.  I became familiar after the campaign period, is

22  what I was trying to specify. During the campaign

23  period, I didn't know how he was holding himself out. I

24  don't monitor everyone's social media.

25      Q.  Okay. You know that Mr. Anthony was making social

1    media posts on behalf of the Union?

2              MR. MILNER:  Objection.

3              HEARING OFFICER DUNN:  What's your

4    objection?

5              MR. MILNER:  Asked and answered.

6              HEARING OFFICER DUNN:  Okay. Yeah, I think

7    that's true. Mr. Larkin.

8              MR. LARKIN:  That that question was asked

9    and answered?

10             HEARING OFFICER DUNN:  Repeat the question.

11             MR. LARKIN:  Now of course. I forget what it

12   was.

13   BY MR. LARKIN:

14       Q.  I believe that the question was -- well, Mr.

15   Spence had said I believe Mr. Spence had said you don't

16   monitor everyone's social media accounts and things that

17   they're doing. And I think what I had asked was that Mr.

18   Anthony -- is he aware that Mr. Anthony was operating

19   the ALU's Twitter account at times and making Twitter

20   posts on behalf of the Union?

21             HEARING OFFICER DUNN:  You can respond to

22   that, Mr. Spence.

23   BY MR. LARKIN:

24       A.  No.  Mr. Anthony was not operating the ALU'S

25   Twitter account and making posts on behalf of the Union.

1    Q.  Who was doing that?

2    A.  It was either myself or Brett Daniels.

3         MR. LARKIN:  Okay. I don't know how long I'm

4    going to keep going down with these questions. So why

5    don't we just go back to the public room and if I turn

6    back to individual names, then maybe we can come back.

7    But my questioning on this -- I intended to start with

8    names, but this is sort of the direction we're going.

9    We're not really talking about names, so, I mean, I'm

10   fine to stay, I'm fine to go, whatever everyone wants.

11        HEARING OFFICER DUNN:  All right.  Well, we

12   will go and then Mr. Larkin, just let us know when we

13   should return.

14        MR. LARKIN:Okay.

15        (Leaves the breakout room)

16        HEARING OFFICER DUNN: Mr. Larkin, you may

17   proceed.

18   BY MR. LARKIN:

19   Q.  Okay. Mr. Spence, is it correct that the bylaws

20   of the ALU constitution provides that members of the

21   workers committee are considered stewards?

22        MR. MILNER:  Objection The Constitution an

23   bylaws speak for themselves.

24        HEARING OFFICER DUNN:  Sustained.

25   BY MR. LARKIN:

```
 1    Q.  Okay.  Let me ask you this. Is everybody who's on
 2  the organizing committee considered a steward?
 3    A.  Stewards are a position that is intended to exist
 4  to enforce a contract. So no, because we don't have a
 5  contract, they don't fulfill the role of stewards.
 6    Q.  So the Union has not designated anybody to be a
 7  steward?
 8    A.  No. And it says in our constitution that stewards
 9  have to be democratically elected. To this date, there's
10  not been an election for a steward.
11    Q.  During the campaign, Mr. Spence, did the Union
12  set up tables in break areas of the JFK8 facility?
13    A.  Yes.
14    Q.  At these tables, the Union would talk with
15  employees about the campaign, is that correct?
16    A.  Yes.
17    Q.  Hand out things like t-shirts and flyers?
18    A.  Yes.
19    Q.  Well, let me ask you this way. Certainly there
20  were times where you would sit at those tables, correct?
21    A.  Yes.
22    Q.  And there are obviously times where other people
23  would sit at the tables?
24    A.  Yes.
25    Q.  How was it decided who would sit at the tables
```

1   and talk with employees about the ALU?

2           MR. MILNER:  Objection. I don't know what

3   the relevance is of who decides when someone sits at a

4   table I don't know what this is going to.

5           HEARING OFFICER DUNN: Mr. Larkin?

6           MR. LARKIN:  I mean, just yesterday there

7   was questions elicited by Ms. Mirer about the frequency

8   and of the Union setting up tables and campaigning and

9   who sat at them where they were. So we objected, the

10  testimony was permitted and --

11          HEARING OFFICER DUNN:  Sorry, Mr. Larkin.

12  Go ahead.

13          MR. LARKIN:  Well, no. So I'm asking him,

14  Mr. Spence, some questions about this aspect of the

15  campaign. Again, because I believe that it goes to

16  agency question and apparent authority okay. Anything

17  further than that, we have to talk outside of Mr.

18  Spence's presence.

19          HEARING OFFICER DUNN: All right.

20          MR. LARKIN:  I don't think there's more to

21  say than that.

22          HEARING OFFICER DUNN: All right. The

23  testimony that you referred to from yesterday was

24  permitted as foundational to establish basic banks for

25  the testimony that followed involving a particular

1   incident. So that's why it was permitted at that time.

2   But I'll give you some leeway.  But again, not much

3   because I don't think that there's going to be much that

4   you're going to establish through this line of

5   questioning. Go ahead.

6   BY MR. LARKIN:

7       Q.  My question, Mr. Spence, was how would it be

8   decided who would sit at the ALU's tables and

9   communicate with employees and pass out ALU shirts and

10  flyers?

11      A.  It was on a volunteer basis. Whoever wanted to

12  sit at the table and talk to workers about the Union was

13  permitted to do so.

14      Q.  And how often would the Union set up and operate

15  these tables?

16      A.  The most vocal supporters strive to be there as

17  often as they were available during the campaign period.

18  So many of us, like myself, for instance, we were there

19  every day. I was there every day after my shift and

20  every day on my days off.

21      Q.  And when you were sitting at the tables and

22  talking to employees about the campaign, would you wear

23  ALU paraphernalia?

24      A.  Yes.

25      Q.  And other individuals who were sitting at the

1  tables would also wear ALU paraphernalia, correct?

2     A.  Yes.

3     Q.  And would the Union put out signs near or on the

4  table saying ALU or other identifiers that this was the

5  Union?

6             MR. MILNER:  I'm going to object again, I'm

7  still not sure where this is going. All of this

8  testimony about a table.

9             HEARING OFFICER DUNN:  Yeah.  I think that

10  both on relevance grounds and also cumulative at this

11  point, we have ample testimony in the record with

12  respect to the tables and what was on the tables and

13  where they were. So I'd appreciate it Mr. Larkin, if we

14  can move on.

15             MR. LARKIN:  All right.  So I think we

16  should go back to the breakout room.

17             HEARING OFFICER DUNN:  Okay. Ms. Zellinger,

18  could you assist us please?

19             (Enter breakout room).

20             And once both parties confirm everyone is

21  here that needs to be here. Okay.  Mr. Larkin.

22             MR. LARKIN:  Just a second, I'm looking now.

23  Yeah, I think we got everybody.

24             MR. MILNER:  Actually, you know what? No,

25  I'm sorry, everyone is here.

1        HEARING OFFICER DUNN: Go ahead, Mr. Larkin.

2   BY MR. LARKIN:

3       Q.  Mr. Spence, Mr. Anthony was one of the organizers

4   who would staff the ALU tables, correct?

5       A.  No.

6       Q.  So Mr. Anthony never handed out any ALU

7   literature or sat any ALU table during the entire

8   campaign period?

9       A.  I misunderstood the question. I thought you meant

10  that he was in control of staffing the table. No.  He

11  was one of the people who would volunteer to sit at the

12  table.

13      Q.  And what about Justine Medina?

14      A.  Yes.

15      Q.  And how often would Mr. Anthony sit at the table

16  and distribute ALU campaign material?

17          MR. MILNER:  Your Honor, I object to this

18  entire line of questioning. However many times Mr.

19  Anthony sat at the table is completely irrelevant to his

20  agency status.  As is whether he gave out shirts or gave

21  out lanyards or answered questions, it's all irrelevant,

22  your Honor.

23          MR. LARKIN:  Can we ask Mr. Spence to step

24  out?

25          HEARING OFFICER DUNN:  Mr. Spence, thank

1     you.

2                    (Witness leaves videoconference)

3                    And Mr. Milner, if you could confirm.

4                    MR. MILNER:  Yeah. As soon as he -- okay.

5                    HEARING OFFICER DUNN: All right.

6                    MR. LARKIN:  First of all, Mr. Spence is

7     serving as the ALU's custodian of records. So he's here

8     as an individual. He's also here as the ALU's custodian

9     of records. So I'm asking him general questions about

10    the Union. And so, nothing that I ask Mr. Spence in that

11    regard is cumulative. That's number one. Number two, I

12    couldn't disagree more that this all goes to apparent

13    authority. Associates have no means of distinguishing

14    between the officers of the Union and organizing

15    committee members when they're sitting at the table,

16    speaking on behalf of the Union, passing out literature,

17    hearing ALU paraphernalia. And so, evidence of who was

18    working at these tables is probative of agency status in

19    as much as it goes to the apparent authority of these

20    individuals to act and speak on behalf of the Union.

21    There are different agency statuses for different people

22    in different roles. And one of the ways that we're

23    attempting to establish agency for some of these

24    individuals is by their apparent authority. And the test

25    for that is, what did the bargaining unit think These

1   people -- who they were, were they speaking on behalf of
2   the Union or not? And so the evidence of how these
3   individuals held themselves out to the bargaining unit
4   is probative of that. And so, all of this entire line of
5   testimony is plainly relevant to that. And so, whether I
6   ask about a specific name or not or whether I ask
7   questions that are intended to have the witness testify
8   generally about what happened at these tables, it's all
9   clearly relevant and probative of that issue. And that
10  is what I'm seeking to do here with Mr. Spence. And as
11  the individual who's sort of essentially standing in for
12  the Union, he is the most knowledgeable individual about
13  the ALU and its operations. And so, he's the appropriate
14  person to ask all of these questions.
15              HEARING OFFICER DUNN: Mr. Milner?
16              MR. MILNER:  Your Honor, first of all, there
17  hasn't been any testimony presented in 20 days of
18  hearing that anyone was confused about the authority of
19  anyone who was at the table. In addition to that, Amazon
20  has already had Ms. Medina and Mr. Anthony on the stand,
21  and he could have asked them whatever questions they
22  wanted. So I don't understand why Mr. Spence would be
23  asked these questions. It is irrelevant because under
24  this logic, any Union supporter that chooses to
25  volunteer and help a Union organizing drive becomes an

1    agent of the Union. And that is just not the case law.

2    We are wasting time with irrelevant questions and

3    cluttering the record. It's just irrelevant. It is

4    completely and utterly irrelevant.

5              HEARING OFFICER DUNN:  So Mr. Larkin, we

6    went through a similar argument when Ms. Medina was

7    testifying, and I raised a concern that the testimony

8    that was being elicited with respect to her and her

9    volunteering as an eager volunteer of the Union did not

10   appear to be sufficient to confer agency status under

11   Board case law. And I cited a number of cases in support

12   of that proposition, and I will not repeat that here,

13   but the Board focuses on whether the Union had relied

14   exclusively on such pro-Union employees to convey its

15   message such that the Union is otherwise absent from the

16   campaign, rendering the pro-Union employees the only

17   conduit for Union communication to employees. That's one

18   example, and so far in the record don't have anything

19   remotely close to that. So if that's where we're

20   heading, if we're going to get evidence of that nature,

21   sure. But if we're just going to talk about how many

22   times Mr. Anthony, for example, was present at the table

23   handing out lanyards and buttons and t-shirts, that's

24   not going to get to agency status.

25             MR. LARKIN:  Well, I just respectfully beg

1    to differ. There's evidence in the record, throughout
2    the record of other actions that these and other
3    individuals have taken. And what we have done throughout
4    this case on this particular issue is inappropriately
5    and incorrectly, in my view, look at each witness and
6    each line of questioning in a vacuum, as if that line of
7    questioning either will or won't establish the agency
8    status of Mr. Smith. And that is simply not how it's
9    done. We are entitled to present evidence through --
10   what we're on witness 50 now, or something like that, of
11   the actions taken throughout the campaign by various
12   individuals. This is simply one area that we're looking
13   to do that. And I would state that the witness has
14   testified this morning that when individuals were
15   communicating things like the Union's contract demands,
16   those are the Union's positions, not something that I
17   just decided to make up because I really want a Union.
18   So I'm going to go sit at the Union's table and make up
19   all the things that the Union is going to get for you.
20   He's already testified that's not how this was done. And
21   so I think that some of this evidence that I've already
22   elicited from him is probative of this line of inquiry.
23   And I think that limiting our ability to continue to
24   develop the record on that would be would be
25   inappropriate.

1          MR. MILNER:  Your Honor, the fact that

2    someone parrots a Union campaign or bargaining position

3    does not make them an agent. It makes them a supporter,

4    just as all of this makes them a supporter. And frankly,

5    you've already ruled. So I would suggest that we just go

6    back to the main room and continue on.

7          HEARING OFFICER DUNN:  Mr. Larkin, do you

8    intend to elicit more names where we should stay in the

9    breakout room, or shall we return to the main session?

10          MR. LARKIN:  I might. Yeah.

11          HEARING OFFICER DUNN:  You might right now

12    or you might in a few questions?  I'm just trying to

13    gauge whether we should stay here now or come back.

14          MR. LARKIN:  I gues, Why don't we just stay

15    here now so I can try to finish with that.

16          HEARING OFFICER DUNN:  Okay. All Right. If

17    we could get Mr. Spence back, I'd appreciate it.

18          (Witness re-enters the videoconference)

19          THE WITNESS:  Coming back.

20          HEARING OFFICER DUNN:  Thank you. Okay.  Mr.

21    Spence, I remind you that you remain under oath.  And go

22    ahead, Mr. Larkin.

23    BY MR. LARKIN:

24    Q.  Mr. Spence, do you know how many times that Mr.

25    Anthony worked at the ALU tables during the campaign?

```
 1              MR. MILNER:  Objection. Your Honor, we just
 2    had this conversation.
 3              HEARING OFFICER DUNN:  We did, Mr. Larkin.
 4              MR. LARKIN:  We did.
 5              HEARING OFFICER DUNN:  Yes.  And I ruled.
 6    And so I would ask that you move on.
 7              MR. LARKIN:  I don't understand. I guess I'm
 8    just missing it. How am I supposed to move on? Because I
 9    want to ask about other individuals. We stayed in the
10    breakout room so I could do it. I just did, and I got an
11    objection.
12              HEARING OFFICER DUNN:  Well, I think that
13    you can ask other questions, but the exact example I
14    gave was asking how many times Mr. Anthony was at the
15    table as something that I did not see as being relevant
16    to conferring agency status under Board case law. So
17    just ask a different question.
18              MR. LARKIN:  I think maybe at this point,
19    it'd probably be appropriate for me to make a proffer of
20    the areas that I would like to inquire about, because
21    there are more. And maybe if I could take -- we've been
22    going now for about an hour and a half with Mr. Spence.
23    Anyway, if we could take a three or five minute break, I
24    can put that together, and then we can either do it or
25    we can move to something else.
```

1          HEARING OFFICER DUNN:  Okay. And so, just so

2     I'm clear, we should stay in the breakout room, take a

3     five minute break, you'll come back, make a proffer, mr.

4     Spence will be elsewhere during that proffer, and then

5     we'll determine how we're going to go from there.

6          MR. LARKIN:  Yeah, I think that might help

7     speed things along.

8          MR. MILNER:  Is the proffer going to have

9     specific names in it.

10          MR. LARKIN: Yes.

11          MR. MILNER: Okay.

12          HEARING OFFICER DUNN:  That'S fine. So let's

13     go off the record. Five minutes.

14          (Off the record)

15          (On the record).

16          HEARING OFFICER DUNN:  And we are back on

17     the record. Go ahead, Mr. Larkin. You're muted, Mr.

18     Larkin.

19          MR. LARKIN:  Sorry about that -- I'm getting

20     a message. Oh, never mind. I thought one of our folks

21     had been kicked out of the breakout room, but we're

22     good. If permitted, I would ask Mr. Spence about the

23     number of times that Jason Anthony, Justine Medina,

24     Cassio Mendoza, Tristan Martinez and Jordan Flowers

25     staffed the ALU's break room tables. I would ask Mr.

1    Spence additional questions about how he and the Union
2    determined a schedule for who would sit at the tables
3    and when.
4             HEARING OFFICER DUNN:  Okay. Mr. Spence has
5    already testified that individuals volunteered to serve
6    at the ALU table when they were available.
7             MR. LARKIN:  I believe he also intimated
8    that there were some decisions made, and I would
9    question him about how it was decided who would come
10   when. In other words, I don't understand his testimony
11   to be there was just an empty table with a bunch of
12   stuff, and anybody could walk up and just work that day.
13   There was a staffing plan. And so, I would ask him
14   questions about that and how that was derived and who
15   participated in making it.
16            HEARING OFFICER DUNN:  Okay. That's not how
17   I understood his testimony.
18            MR. MILNER:  And it definitely wasn't a
19   staffing plan. That implies that, again, that they were
20   employees, these were volunteers.
21            HEARING OFFICER DUNN:  And that was crystal
22   clear in his testimony, I thought. And again, the Board
23   case law is clear that people who volunteer to do the
24   traditional kind of organizing things, getting cards
25   signed, passing out Union paraphernalia, that's not

1  sufficient to confer agency status. So I just don't

2  think that's going to get us there. If you want to

3  clarify the record with respect to how it was determined

4  who was going to stack the tables, I'll permit you to do

5  that. But beyond that, I just don't see how the

6  testimony you're seeking to enter into the record would

7  be relevant to any of the Objections or to proving

8  agency status under Board law.

9           MR. LARKIN:  Okay.  So we note our

10 disagreement on the law, and I guess based on that, we

11 can probably go back to the main room because I won't be

12 asking him questions about individuals.

13          HEARING OFFICER DUNN:  Okay.

14          MS. MIRER:  I think we have to get Connor

15 back to the room.

16          MR. MILNER:  He's coming.

17          HEARING OFFICER DUNN: Let's briefly go off

18 the record while we wait.

19          (Off the record)

20          (On the record).

21          HEARING OFFICER DUNN:  Let's go back on the

22 record.  And I remind you, Mr. Spence, that you remain

23 under oath. And go ahead, Mr. Larkin. And you're muted.

24 BY MR. LARKIN:

25    Q.  Okay.  Mr. Spence, I think where we left off, I

1    was asking you about the break room -- ALU tables in the

2    break room. At some point, I think I asked you a

3    question about how it was determined who would work on

4    any particular day at the tables. Do you know that?

5        A.  Yeah. So like I said, it was essentially on a

6    volunteer basis. If somebody could come in, they might

7    volunteer to work on their break, they might volunteer

8    to stay late after work, they might volunteer to come in

9    on their day off. Generally, there was a sentiment that

10   late in the campaign, everybody should do everything

11   they can to make sure that there was some kind of

12   pro-Union presence in the break room, but it wasn't

13   really coordinated. And there were many days where,

14   unfortunately, we couldn't have anybody in the break

15   room because nobody was available. Or there were times

16   where we had set up the table, place literature on it,

17   but left it unattended.

18       Q.  And how, if at all, would the ALU keep track of

19   who was working at the table on a given day?

20              MR. MILNER:  I'm going to object to this

21   continued use of the term "working." The testimony is

22   clear that they were volunteers.

23              HEARING OFFICER DUNN:  Mr. Larkin, could you

24   please rephrase?

25   BY MR. LARKIN:

1    Q.  Same question. How would the Union keep track of

2    who was sitting at the tables passing out literature or

3    other ALU paraphernalia on any given day?

4    A.  We didn't keep track. There were no scheduled

5    shifts. I could advertise in our organizing chat that I

6    was going to be in the break room on a certain day. If

7    anyone wanted to join me, they were welcome to it. Or I

8    would also say, hey, guys, I'm normally in the break

9    room on this day, but for whatever reason, I'm not

10   available this week. If anyone is open to kind of taking

11   over my presence, it was on a volunteer basis.

12   Q.  Who provided the materials that were given out at

13   the tables?

14   A.  For the most part, I coordinated making and

15   printing the materials.

16   Q.  And what about ALU t-shirts and buttons?

17   A.  I coordinated ordering the t-shirts. The buttons

18   were donated to us.

19   Q.  What about the ALU lanyards?

20   A.  I coordinated ordering the lanyards.

21   Q.  And is it true that in some instances the Union

22   would hand out or collect authorization cards at the

23   tables?

24   A.  Not in the break rooms. The main times where we

25   collected authorization cards, those were the days where

       1    we were outside the building at the bus stop. There's a

       2    distinction I want to draw between that period and the

       3    period where we took to maintaining active presence in

       4    the break room during the election period. And that's

       5    because there was a national settlement between Amazon

       6    and the Board that affirmed our right to be in the break

       7    rooms during our non-working time, and that was around

       8    December and January.

       9       Q.  Did the Union never solicit authorization cards

      10    inside the building? Only outside the building, Is that

      11    your testimony?

      12       A.  There were probably times where people on their

      13    breaks had cards on them and got coworkers to sign them,

      14    but it was never a coordinated effort in the way that we

      15    engaged in card signing outside the building.

      16       Q.  Okay.  So outside the building, the Union --

      17    you're testifying that the Union had table set up in a

      18    way that was sort of similar to the tables inside the

      19    break room?

      20       A.  Yes. The distinction I want to make is that when

      21    we set up tables in the break room, we didn't have

      22    authorization cards on those tables because by that

      23    time, our petition for the election had already been

      24    approved. There was no need to get authorization card

      25    signed. So we had other kinds of literature. We had

1  pamphlets that had to do with the election and surveys

2  about what Amazon workers would like to see in the Union

3  contracts, things of that nature.

4      Q.  Okay.  So when you solicited authorization cards

5  outside the building, who created the cards?

6              MR. MILNER:  Objection. What is the

7  relevance of this?

8              HEARING OFFICER DUNN:  I understood Mr.

9  Spence's testimony to be that the cards were signed

10  prior to the critical period that's relevant to the

11  Objections before me. So I fail to see the relevance of

12  your question, mr. Larkin.

13  BY MR. LARKIN:

14      Q.  Mr. Spence, did the ALU collect any authorization

15  cards after December 22, 2021?

16              MR. MILNER:  I'm going to object again to

17  the relevance. It is Objection 4. And as the argument

18  has been made on multiple occasions, the fact that cards

19  may or may not have been submitted after the filing of

20  the petition is irrelevant, as that is well within the

21  rules of the NLRB.

22              MS. FRIEDHEIM- WEIS:  I join in that

23  objection. Any testimony should not be elicited

24  regarding the showing of interest. It is purely an

25  administrative matter and not litigable, and

1    specifically in the R case manual that no live testimony

2    is to be elicited regarding the showing of interest.

3            HEARING OFFICER DUNN:  Yes.  And I've made

4    that ruling a number of times on the record, so there

5    should not be any testimonial listed regarding the

6    showing of interest.

7            MR. LARKIN:  And I did not seek to elicit

8    such testimony. I asked questions about card signing at

9    ALU tables inside the critical period merely for the

10   purpose of establishing that these tables were being

11   operated by the Union During the critical period.  Mr.

12   Spence made a distinction between activities inside and

13   outside. We've talked extensively about inside. I'm now

14   simply asking him about the distinction that he drew

15   with respect to the Union's tables on the outside.

16           MR. MILNER:  Did I misunderstand the

17   question? Because I thought you were asking who had the

18   authorization cards printed.

19           MR. LARKIN:  All I want to establish, and

20   maybe we can just stipulate to this, is that the

21   authorization cards were created and maintained by the

22   Union. I don't care about any individual.  And the fact

23   that they were solicited at the Unions -- These tables,

24   I think, is relevant to establishing sort of the nature

25   of these tables. These are Unions tables, not some

1   random person.

2              MR. MILNER:  Your Honor, there's just no

3   relevance to authorization cards are not relevant to

4   this proceeding.

5              HEARING OFFICER DUNN:  I'm inclined to

6   agree, Mr. Larkin.

7   BY MR. LARKIN:

8   Q.  Okay.  Mr. Spence, I'm going to show you a couple

9   of documents and ask you some questions about the

10  documents.  First, I guess let me ask you a couple of

11  questions first. So Mr. Spence, did you serve as an

12  observer in the election?

13  A.  Yes.

14  Q.  Okay.  Do you recall what election periods that

15  you served as an observer?

16  A.  I know that I served for the morning session on

17  the first day, and I believe I was also present in the

18  morning session on the second day and another evening

19  session. I don't recall exactly the other session or

20  other sessions. I believe I served at least for three

21  sessions.

22  Q.  So you know that Friday morning, you think maybe

23  Saturday morning and then you're not sure, but another

24  evening?

25  A.  Yeah. I definitely was present for an evening

1  session.

2      Q.  In answering that, are you sort of

3  differentiating between the times that you, sort of,

4  were present at pre-election and post-election

5  conferences as the union's representative from times

6  where you actually stayed and served as an observer?

7      A.  Yeah.  Those were distinct instances. I don't

8  think there was ever a point where I was an observer and

9  also acted as a representative for the pre- and post-

10  conference.

11     Q.  Okay.  So I'd like to ask you to take a look at

12  Employer's Exhibit 2927. Can we put that up? Okay.  And

13  before I go any further -- don't go any further, Molly.

14  Madam Hearing Officer, I'll represent that Employers

15  Exhibit 2927 are the ALU's observer designations. This

16  was a document produced, I believe, by the Amazon Labor

17  Union. I have some questions that I'd like to ask Mr.

18  Spence about, but in order to do that, as we scroll

19  through this, this will reveal individual employee

20  names. So these are designated observers. I don't know

21  whether we need to do this in the breakout room or not,

22  but I defer to you on that.

23         HEARING OFFICER DUNN:  I'll defer to the

24  Petitioner. Mr. Milner?

25         MR. MILNER:  I'm going to ask Connor what he

1  prefers.

2          THE WITNESS:  So this is going to list names

3  of Observers.

4          MR. MILNER:  Yeah, it's the names of the

5  Observers that we provided to the Board.

6          THE WITNESS:  No, I don't have an issue. We

7  don't have to go no breakout with that.

8          HEARING OFFICER DUNN: Please proceed, Mr.

9  Larkin.

10 BY MR. LARKIN:

11   Q.  All right. So Mr. Spence, this is a document that

12 was produced by the Union, and I'll ask you first, do

13 you recognize the first page?

14   A.  I don't recall.

15   Q.  You don't recall whether you ever saw this?

16   A.  I may have seen it before. I really, I don't

17 recall if I've seen it before. I might have.

18   Q.  Did you not produce this document as part of the

19 ALU's document production?

20   A.  I don't have access to that document.

21   Q.  Okay. So this is not a document that you produced

22 as part of the documents that you turned over?

23   A.  I might have produced it.

24          MR. MILNER:  Are you asking him as an

25 individual or as the custodian of records? Maybe we

1    should clarify that.

2    BY MR. LARKIN:

3        Q.  Yeah, the latter?

4        A.  All right, so the custodian record documents, if

5    it was anything to do with the Board processes, then I

6    was assisted by my attorneys in producing that. So if

7    this was produced as part of the custodian records, then

8    yes.

9        Q.  So if Mr. Spence can't authenticate this, can we

10   stipulate to its authenticity as a document produced by

11   the Amazon Labor Union?

12            MR. MILNER:  Yeah.  I'll represent that

13   those were -- I mean, once we get through all of them, I

14   can certainly represent that those are, in fact, the

15   designation of observer forms that were submitted to the

16   NLRB.

17            HEARING OFFICER DUNN:  That stipulation is

18   received.

19   BY MR. LARKIN:

20       Q.  Okay. So Mr. Spence, I want to sort of run

21   through this and ask you about some of the other

22   Observers, if you know.  So can we go to page 2? Okay.

23   So Mr. Spence, do you recall Mr. Anthony serving as an

24   observer during the election?

25       A.  Yes.

1    Q.  And do you know which voting sessions he served

2  in that role?

3    A.  I recall being with him for the morning session

4  of the first day. I believe he was also serving on the

5  evening session of the first day. I don't -- off the top

6  of my head, I don't recall the sessions that everybody

7  served.

8    Q.  Okay.  Well, we'll go through these and see if

9  you remember any. Let's do the next one. Michelle

10  Valentines, do you know who she is?

11    A.  Yes.

12    Q.  And do you recall that she served as an observer?

13    A.  Yeah.  I believe that she also served on that

14  first morning session and possibly that first evening

15  session.

16    Q.  Okay. Let's do the next one. Do you know Sean

17  Davidson?

18    A.  I don't personally know him.

19    Q.  Okay. Do you know when he served as an observer?

20    A.  I do not.

21    Q.  Okay. Let's do the next one. Brima Sylla?

22    A.  Yes.

23    Q.  I don't know if I'm pronouncing that cortrectly.

24  Do you know him?

25    A.  Yes.

1    Q.  And do you know when he served as an observer?

2    A.  I don't recall an exact session, but I know at

3  one point he and I were observers on the same evening

4  session.

5    Q.  Okay.  So he was with you on some evening

6  session, you just don't know which one?

7    A.  Yes.

8    Q.  Okay.  Let's go to the next one. Antonio Mendoza.

9  Do you know Mr. Mendoza?

10    A.  That's Cassio Mendoza. Cassio is his preferred

11  name. Yes, I know him.

12    Q.  And do you recall which, if any, days he served

13  as an observer?

14    A.  I don't recall a specific day. I know I also was

15  an observer at the same evening session as him. I don't

16  remember which one.

17    Q.  Let's do the next one. Okay. Mr. Palmer. You know

18  Mr. Palmer?

19    A.  Yes.

20    Q.  And do you recall when Mr. Palmer was -- served

21  as an observer?

22    A.  No.

23    Q.  All right. Let's do the next one. Angelika

24  Maldonado, You know Ms. Maldonado?

25    A.  Yes.

1    Q.  And do you know when Ms. Maldonado served as an

2  observer?

3    A.  No.

4    Q.  Okay.  Let's see. How many more do we have? Next

5  one. Brett Daniels. You know Mr. Daniels?

6    A.  Yes.

7    Q.  And do you know which sessions he served as an

8  observer?

9    A.  No.

10   Q.  All right. Let's do the next one. Karen Ponce, do

11  you know Ms. Ponce?

12   A.  Yes.

13   Q.  And do you know hich sessions she served as an

14  observer?

15   A.  No.

16   Q.  Okay. Do the next one, I think we're almost done.

17  Tristan Dutchen. Do you know Mr. Dutchen?

18   A.  Yes.

19   Q.  And do you know which sessions he served as an

20  observer?

21   A.  No.

22   Q.  And then I think there's one more. Tristan

23  Martinez, do you know Mr. Martinez?

24   A.  Yes.

25   Q.  And do you know which sessions that he served as

1  an observer?

2      A.  No.

3      Q.  All right.  I think we can take that down, Molly.

4  Mr. Spence can't authenticate the document, but I know

5  we have a stipulation as to its authenticity. I would

6  like to move for its admission into the record based on

7  that stipulation.

8          HEARING OFFICER DUNN:  Could you put the

9  exhibit back up, Ms. Hanratty? 2927. And I just have a

10  question, and perhaps it's for Mr. Milner. The dates up

11  in the top right, Did you put those dates in there, Mr.

12  Milner.

13          MR. MILNER: I put those down when I

14  submitted them to the NLRB, yes.

15          HEARING OFFICER DUNN: Okay. That's all I

16  needed. And any objection to the receipt of 2927 based

17  on the stipulation between the parties That I received.

18          MR. MILNER:  No objection.

19          HEARING OFFICER DUNN:  Okay. Ms. Weis.

20          MS. FRIEDHEIM- WEIS:  No objection.

21          HEARING OFFICER DUNN:  All right. 2927 is

22  received.

23  (Employer's Exhibit 2927 received)

24  BY MR. LARKIN:

25      Q.  I guess. One other question, Mr. Spence. If you

1    know, can you put those back up, Molly?  Do you know Mr.

2    Spence, what the date the handwritten dates in the top

3    right hand corner of each page of Exhibit 2927 mean?

4        A.   The handwritten dates in the top right.

5        Q.   Yeah. So we're looking at the page that is

6    Justine Martinez's designation form. And there's a

7    handwritten 330 in the top right hand corner. Do you

8    know what that means?

9        A.   No.

10       Q.   Okay. All right.  We can take that off. All

11   right.  Let's see here. Mr. Spence, one of the ways that

12   the Union communicated with associates was through text

13   messages; is that correct?

14       A.   Yes.

15       Q.   Okay. Can I ask that we put 516 up. And before we

16   do, Molly, can we make sure that it's the redacted one?

17   Okay.  Good. So Mr. Spence, I put up on the screen, a

18   document, a photo of a text thread. We've marked it

19   Employer 516.  For confidentiality reasons, we've

20   redacted the phone number at the top. And my question to

21   you is, do you recognize the messaging in the texts in

22   the photo?

23       A.   Yes.

24       Q.   And can you tell us what those are?

25       A.   So at a point during the campaign, we tried to

1   set up a text banking campaign, having volunteers that

2   were Amazon workers reach out to their coworkers to talk

3   about the Union and spread information that they needed

4   to know for the election.

5       Q.  Okay. And who drafted, If you know, the language

6   that we're looking at in these text messages?

7       A.  It was kind of a group effort and then approved

8   by the executive board.

9       Q.  And to whom -- now, this obviously is a text

10  message that was received by one individual. But who did

11  the Union send these text messages out to?

12      A.  The workers that were on the Excelsior list. So

13  workers that we believed to be bargaining unit numbers.

14      Q.  Now -- Okay. And where it says at the top of the

15  message, this is Mitch, I'm an LDJ5 worker and an

16  organizer with the ALU. Is Mitch, like, an actual

17  person?

18      A.  Yes.

19      Q.  Do you know who that is?

20      A.  Yes.

21      Q.  Who is that? Before I -- Ms. Dunn, I guess I'm --

22          MR. MILNER:  Object. I'm objection to

23  relevance. What difference does it make.

24          HEARING OFFICER DUNN:  I agree. Mr. Larkin,

25  I don't understand why we need to identify that

1   particular individual.

2            MR. MILNER:  Sending texts on behalf of the

3   Union does not make one an agent of the Union. It makes

4   someone a volunteer and a supporter.

5            MR. LARKIN:  Yeah. Again and again, we're

6   doing the same thing. We're looking at evidence in a

7   vacuum, which is the inappropriate way to do it. And a

8   determination about various individuals and their legal

9   status can be made at the conclusion of the hearing,

10  based on all the evidence that's submitted.  Simply

11  trying to identify if Mitch is a real human being or a

12  made up name.

13           HEARING OFFICER DUNN:  Mr. Larkin? Sorry.

14  516 itself states that that person purportedly named

15  Mitch is an LDJ5 worker.  That's not even an employee of

16  JFK8. So I just did not think that Mitch's name, if he

17  exists as an actual person, is going to be relevant to

18  the Objections before me or to the agency status.

19           MR. LARKIN:  Well, but the text goes on to

20  say, on March 25 to 30th, we have a chance to make

21  history, et cetera. So the individual is clearly

22  referring to the election in this case, not any other

23  case. And it is certainly true that individuals who are

24  not employees at JFK8, or even not employees of Amazon,

25  can be agents of the Amazon Labor Union.

1          MR. MILNER:  But sending a text telling

2    people to vote does not make one an agent. There's no

3    amount of text message evidence that's going to create

4    an agency relationship here. It's just going to clutter

5    the record.

6          HEARING OFFICER DUNN:  I'm inclined to

7    agree, Mr. Larkin.

8          MR. LARKIN:  Okay, well, we'll note our

9    disagreement, and based on Mr. Spencer's testimony would

10   move the admission of 516.

11         HEARING OFFICER DUNN:  Mr. Milner.

12         MR. MILNER:  I object to the relevance.

13         HEARING OFFICER DUNN:  Ms. Weis.

14         MS. FRIEDHEIM- WEIS:  Doesn't really go to

15   Objections 1 through 12, but legally speaking, as far as

16   apparent authority, it's irrelevant.

17         HEARING OFFICER DUNN:  I agree to the extent

18   that Employer's 516 is being offered to prove agency

19   status. It's not relevant.

20         MR. LARKIN:  Well, it's being offered in

21   support of Objection 17, regardless of who Mitch is.

22         MR. MILNER:  I object again, then, because

23   it clearly does not -- it doesn't go towards Objection

24   17 at all. Objection 17 is that the Petitioner

25   unlawfully pulled employee support, engaged in unlawful

1   interrogation, and created the impression of

2   surveillance during the critical period.  Simply asking

3   someone, can I count on you to vote yes? It's certainly

4   far away from unlawful polling by any objective

5   standard. It's certainly not interrogation, and I don't

6   know how a text message to someone that you can reply

7   stop to if you don't want to receive them anymore could

8   possibly create the impression of surveillance.

9              HEARING OFFICER DUNN:  Ms. Weis, as to

10   Objection 17, any objection?

11              MS. FRIEDHEIM- WEIS:  RD rep will not take

12   position regarding Objection 17.

13              HEARING OFFICER DUNN:  Mr. Larkin, so the

14   portion of 516, at least the page that we're seeing, the

15   very top message, so am I correct that you're relying on

16   the "Can I count on you to vote yes?" Portion as

17   relevant to Objection 17.

18              MR. LARKIN:  Yes. We believe this message,

19   in conjunction with other evidence that's been elicited

20   during the hearing, is probative of Objection 17,

21   particularly in light of Mr. Spencer's testimony that

22   this message was sent to everyone on the Excelsior list.

23              HEARING OFFICER DUNN:  Okay.  I will admit

24   Employer 516 noting the relevant objection from both

25   counsel. Bot as to 8 and as relevant to Objection 17.

1   (Employer's Exhibit 516 received)

2   BY MR. LARKIN:

3      Q.  Okay.  We can take that down. Mr. Spence, is it

4   true that another method that the Union used to

5   communicate with the bargaining unit was through the

6   distribution of flyers?

7      A.  Yes.

8      Q.  Who generated the content that went on to the

9   Union's flyers?

10     A.  For the most part --

11            MR. MILNER:  I'm going to object. I don't

12  know. Again, are we asking who generated the content?

13  Are we asking who approved the content? Because I'm not

14  sure. Where are we going with this again.

15            MR. LARKIN:  Well, we can ask -- I mean, I

16  certainly can rephrase, and I think what I intended to

17  get to here is who would approve the content that was

18  ultimately distributed via ALU flyers.

19            HEARING OFFICER DUNN: Mr. Spence, go ahead.

20  BY MR. LARKIN:

21     A.  Okay. Essentially, it was approved by the

22  executive board.

23     Q.  Okay. I want to show you a couple of documents

24  and ask you a few questions about them. Can we put up

25  2921, please? Actually, well, I don't know if I'm going

1   to put these up in order, but that's fine. We'll take

2   them as they come. 2921. Mr. Spence, 2921 is actually a

3   front and back document. So I'm showing you page 1, and

4   that's page 2. And I'll represent this is a document

5   that you produced to us last night. Do you recognize

6   2921?

7     A.  Yes.

8     Q.  And what is it?

9     A.  It's a quarter sheet flyer or leaflet that we

10   would hand out to workers during the campaign period.

11     Q.  All right.

12     A.  It was the one we handed out two days before the

13   polling started.

14     Q.  Okay. And that's why I said I was going out of

15   order, because they're going to be other ones that were

16   chronologically, I believe, earlier. But in any case, I

17   would offer 2921 at this time.

18           HEARING OFFICER DUNN:  Any objection, Mr.

19   Milner?

20           MR. MILNER:  Relevance.

21           HEARING OFFICER DUNN:  And Ms. Weis?

22           MS. FRIEDHEIM- WEIS:  I don't have an issue

23   with the substance of the flyer, but I don't see how

24   it's relevant to any of the Objections.

25           HEARING OFFICER DUNN: I'm inclined to agree.

1    Mr. Larkin.

2              MR. LARKIN:  Well, I'm not going to ask the

3    witness any other questions about it, so I suppose that

4    I suppose that we can just go ahead and do this. But the

5    flyer states you can vote anytime the polls are open,

6    even during your shift. That is relevant to Objections,

7    I believe. 6 and 7, there has been testimony elicited

8    and attempted to be elicited about Amazon's

9    communications with employees regarding the release

10   schedule and voting times. And so that testimony was

11   admitted over our Objections, I would add. And so I

12   believe that the fact that the Union was communicating

13   similarly to associates is at minimum. If testimony

14   about Amazon's communications regarding voting times is

15   admissible, then testimony and evidence from the Union

16   regarding any of its communications about the same

17   subject should be admissible.

18             HEARING OFFICER DUNN:  Okay, one at a time.

19   We'll start with Mr. Milner, please.

20             MR. MILNER:  Your Honor, the release

21   schedule, the testimony about that, that has to do with

22   Objection 6, because it is Amazon that came up

23   essentially with the form of release schedule that we

24   all agreed to, necessarily because Amazon -- it's

25   Amazon's plant or facility and they make the schedules

1    and they would be in the best position to create the

2    release schedule. And we all went along with it. And

3    then it turned out that the way the release schedule was

4    created arguably created lines, especially on the first

5    day of voting. However, here, the fact that there is a

6    flyer that just contains true information is completely

7    different from the circumstance Mr. Larkin is speaking

8    about. The fact that you can vote anytime the polls is

9    open is true. So that is relevant to nothing. The fact

10   that Amazon may have gone out of their way to create a

11   release schedule in which people were released multiple

12   nights and then the managers encouraged everyone to go

13   vote all at the same time is relevant. That's the

14   difference here, Your Honor. And that is why this

15   document is irrelevant.

16            HEARING OFFICER DUNN:  Okay. And Ms. Weis,

17   go ahead.

18            MS. FRIEDHEIM- WEIS:  My issue, now that Mr.

19   Larkin has explained himself as to why he plans to use

20   exhibit 2921, I do object because when he's talking

21   about Objection 6 and 7, that goes directly in squarely

22   and solely to the function of the NLRB and how it ran

23   the election. So there is no relevance and no connection

24   as to how and what the Union may have put together in a

25   flyer.

1     HEARING OFFICER DUNN:  Yes.  I agree that

2 2921 is not relevant with respect to Objections six and

3 Seven pertaining to the Region's alleged actions. And in

4 particular, Objection 6 is about the region's staffing

5 and equipment. And objection seven is about alleged

6 turning away voters and telling voters are only being

7 allowed to vote in alphabetical order. 2921 is not

8 relevant. It's rejected.

9     MR. LARKIN:  So on that basis, I'd like to

10 ask the Hearing Officer to revisit and strike the

11 testimony that has been elicited to this point in the

12 hearing about the release schedule and testimony

13 regarding the release of voters to vote in the election.

14 If, as Ms. Weis contends, that is irrelevant to

15 Objection 6, the testimony should never have been

16 elicited over our Objection, it should be struck and it

17 should not be considered by the Hearing Officer in

18 making her ruling.

19     MR. MILNER:  Your Honor, that testimony, as

20 I just explained, was offered for a wholly different

21 reason.

22     HEARING OFFICER DUNN:  Yes.  And the reason

23 that Mr. Milner gave is the reason why I received it.

24 Because if the question is what caused the lines, that

25 testimony is relevant to that.

1           MR. LARKIN:  Right. And that is exactly why

2    I am offering this exhibit. What caused the lines? And

3    so it could be more than one thing. We obviously contend

4    that it was the NLRB's mismanagement of the election.

5    Testimony has been elicited since then, that somehow it

6    was Amazon's responsibility, this flyer and this

7    statement true -- Or whether it states a fact, whether

8    it states the truth or not, is irrelevant. We contend --

9    suggest that perhaps to the extent the Union was

10   communicating a very similar message to the company as

11   to releasing and when employees can vote, that it is at

12   least more possible than not. Rule 401. We have trouble

13   with that rule in this case. But under Rule 401, it is

14   more possible that it is at least possible that this

15   communication also had something to do with it.

16           So if we are going to accept evidence that

17   suggests that Amazon played some role in the creation of

18   the lines, then it is beyond inequitable to not take

19   evidence that perhaps the Union was also complicit in

20   that result. And I would add that everyone agreed to the

21   release schedule. So if this is evidence of nothing, the

22   release schedule is likewise evidence of nothing.

23           HEARING OFFICER DUNN:  Okay.  Obviously, Mr.

24   Lark, in the comments you just made, elicited the need

25   for both counsel to weigh in again. Mr. Milner, go

 1    ahead.

 2              MR. MILNER:  Your Honor -- Well, first of

 3    all, I thought you had already ruled on this.

 4              HEARING OFFICER DUNN:  I did.

 5              MR. MILNER:  Okay.  But the flyer by the

 6    Union is wholly different than Amazon's manager's

 7    actions with respect to the release schedule. It's

 8    apples and oranges. It's that simple.

 9              HEARING OFFICER DUNN:  Ms. Weis.

10              MS. FRIEDHEIM- WEIS: Thank you, madam.

11    Hearing Officer first, and I think it was mistaken. But

12    Mr. Larkin attributed some argument that I made

13    regarding the release schedule. I've said nothing about

14    the release schedule. So I will just reiterate that

15    offering this document, employers Exhibit 2921, as. It

16    pertains or allegedly pertains to Objection 6 and seven,

17    which is regarding the mechanics of how the Board

18    handled the election. The Union creating a flyer with

19    whatever information it contained and with whatever

20    information Amazon may have provided to employees is

21    irrelevant, period.

22              HEARING OFFICER DUNN:  And I've made my

23    ruling. The ruling stands.

24              MR. LARKIN:  So on that basis, we'd ask that

25    employers 2921 be placed in the rejected file.

1           HEARING OFFICER DUNN: That's granted.

2    (Employer's Exhibit 2921 received in rejected exhibit

3    file).

4           MR. LARKIN:  We can take that down and put

5    up 2918.

6           MR. MILNER: I just want to point out again,

7    I want to make clear, Mr. Larkin, just put on the record

8    before that there seems to be a problem with Rule 401

9    being interpreted properly in this forum. I don't

10   believe there has been any such issue with the

11   interpretation of Rule 401. I don't believe that the

12   Hearing Officer should be undermined in that manner.

13          MR. LARKIN:  Well, we disagree. The rules of

14   evidence are applicable so far as practical in Board

15   proceedings. Everyone who's ever practiced in Board

16   procedure knows that means that the rules are relaxed,

17   not tightened. And the vast majority of evidentiary

18   rulings that have denied Amazon the ability to introduce

19   evidence have been on grounds that, in our judgment,

20   represent a tightening of the federal rules of evidence.

21   Things that would be admissible in federal district

22   court have been deemed inadmissible here. I believe it's

23   inappropriate, and I'm noting my objection for the

24   record as I'm entitled to do.

25          HEARING OFFICER DUNN:  Well, the record will

1   speak for itself.

2   BY MR. LARKIN:

3       Q.  So with that, I put up 2918.  And I would ask Mr.

4   Spence to verify that this was another flyer that he

5   produced to us. Page 2 has the same statement regarding

6   the polls. We would offer it for the same reason.

7               MR. MILNER:  I object for the same reason.

8               HEARING OFFICER DUNN:  Ms. Weis.

9               MS. FRIEDHEIM- WEIS:  If it's meant to speak

10  toward objections six and seven, I object for the same

11  reasons that I've objected to previously.

12              HEARING OFFICER DUNN:  And I will grant both

13  Petitioner and the RD rep a standing objection on those

14  bases that they stated with respect to 2921. I make the

15  same ruling with respect to 2918. It is rejected.

16              MR. LARKIN:  Okay. Yes. Can we please have

17  -- we would ask the 2918 be placed in the rejected

18  exhibit file.

19              HEARING OFFICER DUNN: That's granted.

20  (Employer's Exhibit 2918 received in rejected exhibits

21  file)

22  BY MR. LARKIN:

23      Q.  Mr. Spence, I'm going to ask you about a couple

24  of more of these. Can we do 2914, please?  Mr. Spence,

25  I'll represent this is another flyer that you produced

1    to us last night. It's a two-page document, and I'll ask

2    you, do you recognize 2914?

3       A.  Yes.

4       Q.  And can you tell us what it is?

5       A.  It is information that was given out to

6    associates informing them of Amazon's manufactured

7    arrests of Union organizers.

8       Q.  Would offer 2914 in support of Objection 16.

9            MR. MILNER:  Object to the relevance

10   objection 16 is that non-employee Petitioner organizers

11   repeatedly trespassed on the employer's property. I'm

12   not really sure how this flyer goes towards that

13   Objection.

14           HEARING OFFICER DUNN:  Oh, sorry, Mr.

15   Larkin.

16           MR. LARKIN: I was going to say we've had a

17   variety of evidence throughout the hearing about the

18   Union's communications regarding that event that's been

19   admitted. Again, I'm asking Mr. Spence, in his capacity

20   as the custodian of the ALU's records about these

21   events, which we haven't done to this point.

22           MR. MILNER:  It doesn't make the document

23   itself relevant to these objections.

24           HEARING OFFICER DUNN:  Ms. Weis.

25           MS. FRIEDHEIM- WEIS:  Again, we're talking

1   about Objection 16, which is not encompassed in one

2   through twelve. But in reading the objection, the

3   objection speaks to trespass, not about leafletting.

4           HEARING OFFICER DUNN:  Mr. Larkin.

5           MR. LARKIN:  I guess I'd like to make a

6   standing objection for the record to the Regional

7   Director representative offering objections to evidence

8   that does not go to the Board Objections. This has

9   happened throughout the hearing, and I'm not quite sure

10  why it continues, but I'll make a standing objection on

11  that basis.

12          MR. MILNER:  I don't think there was an

13  objection made by her on that basis. She very

14  specifically before said she was objecting because it

15  was Objection 6 and eight, which go directly to the

16  region.

17          MS. FRIEDHEIM- WEIS:  May I respond, madam

18  Hearing Officer.

19          HEARING OFFICER DUNN:  Yes, you may, Ms.

20  Weis.

21          MS. FRIEDHEIM- WEIS:  So of course, I have

22  directly responded and made objections and/or motions

23  regarding objections one through twelve, and only when

24  asked by you specifically to give an opinion. I am an

25  attorney, and so I have couched very carefully that

1  while it may not go toward objections one through

2  twelve, as an attorney, I give my legal opinion, I did

3  not make an official objection. I gave a legal opinion.

4  I am an attorney and I have a right to give a legal

5  opinion.

6          HEARING OFFICER DUNN:  Right.  When an

7  exhibit is offered, I ask if either the Petitioner or

8  the RD rep has an objection, and that is when you have

9  stated your opinion. So the record will reflect that.  I

10  will receive 2914 and give it the weight that it

11  warrants.

12  (Employer's Exhibit 2914 received)

13  BY MR. LARKIN:

14      Q.  Let's do 2917. And Mr. Spence, I'll represent

15  that this is a document you produced to us last night.

16  Do you recognize 2917?

17      A.  Yeah. Is there another page to this?

18      Q.  There is not another page.

19      A.  Okay.  Then yes.

20      Q.  Can you tell us what it is?

21      A.  So it's an informational flyer detailing which

22  unions and social movements have supported the ALU in

23  various ways through donations of resources or

24  expertise.

25      Q.  We'd offer 2917 at this time.

1          MR. MILNER:  Objection. Sorry.

2          HEARING OFFICER DUNN:  I was cutting to the

3    chase. Before I asked you, Mr. Milner, what objection

4    are we offering 2917 for.

5          MR. LARKIN:  18.

6          MR. MILNER:  Your Honor, either what is

7    stated here is true and then it is clearly relevant to

8    nothing, or it's a misrepresentation. And according to

9    case law from 1982 that has been in effect ever since, a

10   misrepresentation is not objectionable. So this document

11   is irrelevant.

12         MR. LARKIN:  Well, the objection I think

13   pretty clearly states that the Union asserted at the end

14   of the campaign, that they were backed by more

15   established unions actively involved in the union's

16   campaign providing funding and other services. So I

17   think this flyer is directly relevant to that assertion.

18         HEARING OFFICER DUNN:  Ms. Weis.

19         MS. FRIEDHEIM- WEIS:  I have no objection.

20         HEARING OFFICER DUNN:  Mr. Spence, can I ask

21   you a question about 2917. Do you know or have an

22   estimate regarding when this leaflet was handed out.

23         THE WITNESS:  It was at some point during

24   the campaign period.

25         HEARING OFFICER DUNN:  Okay.  But you cannot

1    estimate what time period?During the critical period?

2              THE WITNESS:  I mean, I would reject the

3    notion that it was an 11th hour communication. It was

4    something that -- it a was messaging that was

5    communicated throughout the campaign period and before

6    and was formalized in the form of this flyer. The

7    contributions that these groups made, their

8    contributions from before the critical period and

9    during. So it was probably early on in the campaign

10   period that we formally started conveying this message.

11             HEARING OFFICER DUNN:  All right.  I'm going

12   to receive 2917.

13   (Employer's 2917 received)

14             MR. MILNER:  Your Honor, I just want to

15   point out Make the Road New York is not a labor union,

16   and I don't know that the coalition of black trade

17   unionists is a Labor Union I'm not 100 percent sure.

18             MR. LARKIN: Those are facts that Mr. Milner

19   is free to explore with the witness when it's his turn.

20   You can take it down, Molly. 2916. Can we put that up?

21   BY MR. LARKIN:

22   Q.  Mr. Spence, this one is a two-pager. I'll

23   represent, again, this is a document you produced to us

24   yesterday evening. You can see page 2 there. Do you

25   recognize exhibit 2916?

1    A.  Yes.

2    Q.  And can you tell us what it is?

3    A.  Well, in response to the company's repeated

4    claims that the ALU was an organization with no

5    experience, we wanted to assure bargaining unit members

6    that despite the fact that the ALU was newly formed, we

7    had been receiving donations of advice and expertise and

8    other kinds of resources from established unions as an

9    act of solidarity.

10   Q.  I'd offer 2916.

11        HEARING OFFICER DUNN:  Mr. Milner.

12        MR. MILNER:  Same objection as the last one.

13   It's not relevant to objection 18.

14        HEARING OFFICER DUNN:  Ms. Weis.

15        MS. FRIEDHEIM- WEIS:  No objection.

16        HEARING OFFICER DUNN:  Same question for

17   you, Mr. Spence, that I had before regarding 2917. Any

18   idea of the time period in which 2916 was handed out?

19        THE WITNESS:  Can we go back to the other

20   page? So eleven days before the opening of the polls.

21        HEARING OFFICER DUNN:  Okay. All right, so I

22   will receive 2916. (Employer's Exhibit 2916 received).

23   BY MR. LARKIN:

24   Q.  Is another two-pager, Mr. Spence that you

25   produced last night to us. So page 1 and then page 2.

1    And so, the question would for you is, do you recognize

2    2920?

3        A.  Yes.

4        Q.  And can you tell us what 2920 is?

5        A.  Well, leading up to the campaign period and in

6    the early days of the campaign period, we had

7    communicated to workers that dues would be

8    democratically decided being that we are a newly formed

9    organization, there was no established dues rate.

10   However, the response that we received from workers is

11   that they would prefer a more concrete number to wrap

12   their head around. And so, the Workers Committee came

13   together and made a proposal that is subject to approval

14   after we have a contract of $5 per week. And this is a

15   flyer that is communicating that to potential bargaining

16   unit members.

17       Q.  And do you know when approximately the Union

18   would have been handing out 2920?

19       A.  Quite early on in the campaign period, maybe late

20   January, early February.

21       Q.  Okay.  So I would offer 2920 in support of

22   Objection 14?

23               MR. MILNER:  Mr. Milner?

24               MR. MILNER:  I'm going to object. I don't

25   know how this is relevant to anything misleading or

1   being confusing. In fact, it says in big capital, bold

2   letters, pending voting approval and authorization of

3   all members.

4           HEARING OFFICER DUNN: Ms. Weis.

5           MS. FRIEDHEIM- WEIS:  I don't see the

6   relevance, but I don't have an issue with the substance

7   of the flyer.

8           HEARING OFFICER DUNN:  All right.  I'm going

9   to receive 2920.

10  (Employer's Exhibit 2920 received)

11  BY MR. LARKIN:

12    Q.  Okay. Let's see. Okay.  That one was already

13  done. Okay. Can we do 491, please? Okay.  Mr. Spence. So

14  now I've got up on the page, exhibit 491. It's a

15  two-page document. I believe you might have produced

16  this one to us. I'm not entirely certain. I think you

17  did. But my question to you is, nevertheless, do you

18  recognize Exhibit 491?

19    A.  Yes.

20    Q.  And can you tell us what that is?

21    A.  An informational flyer, can we go to the next

22  page?

23    Q.  Go ahead, Molly. To the next page.

24    A.  An informational flyer that goes to when, after

25  winning the election, members could expect to start

1  paying dues. And we wanted to communicate that dues

2  payments would not start until after a contract had been

3  negotiated and the membership had voted to approve that

4  contract.

5      Q.  And would it be fair to say that -- can you go

6  back to the first page, molly?  It would be fair to say

7  that this is a fire that you handed out ten days prior

8  to the opening of the polls?

9      A.  Yes.

10     Q.  Okay, offer 491.

11             HEARING OFFICER DUNN: Mr. Milner.

12             MR. MILNER:  Same objection.

13             HEARING OFFICER DUNN: Ms. Weis.

14             MS. FRIEDHEIM- WEIS:  No objection.

15             HEARING OFFICER DUNN:  I will receive 491.

16  (Employer's Exhibit 491 received)

17             MR. LARKIN:  Would it be possible to take a

18  five minute lavatory break at this point?

19             HEARING OFFICER DUNN:  Sure. Off the record.

20  Five minutes record.

21             (Off the record)

22             (On the record)

23             HEARING OFFICER DUNN: Let's please go back

24  on the record. And Mr. Spence, I remind you that you

25  remain under oath. Go ahead, Mr. Larkin.

BY MR. LARKIN:

Q. Okay. Mr. Spence, it's true that another manner by which the ALU tried to communicate with bargaining unit employees during the campaign was through social media; is that correct?

A. Yes.

Q. The ALU had a Twitter account, is that right?

A. Yes.

Q. Who was responsible for posting content to the Twitter -- ALU's Twitter account?

A. Primarily Brett Daniels, but also I have access, and I would tweet from time to time.

Q. Okay. So I want to just show you a couple of documents and ask you some questions about those. Let's do -- can we do, Molly, 229? So I'm showing you, Mr. Spence, a document that we've marked Employer's Exhibit 229. I'm focusing on the part up in the very top left of the document where it says Amazon Labor Union retweeted. Do you see that?

A. Yeah.

Q. Do you recognize Exhibit 229?

A. Yes.

Q. Can you tell us if this is a tweet from Mr. Smalls that the ALU retweeted?

A. Yes.

1    Q.  Did The ALU retweet this document on the 25th of

2  March 2022?

3    A.  I'm not sure if it is from the original Tweet or

4  from the Retweet.

5    Q.  Okay.  So the retweet would have necessarily

6  occurred after the original Tweet?

7    A.  Yeah.

8    Q.  All right.  So I would offer 229 at this time.

9           HEARING OFFICER DUNN:  Mr. Milner.

10           MR. MILNER:  You're offering the Tweet and

11  the video or I'm not sure what it is that you're --

12           MR. LARKIN:   Just the tweet. I believe that

13  the video is already in evidence.

14           MR. MILNER:  No objection.

15           HEARING OFFICER DUNN: Ms Weis?

16           MS. FRIEDHEIM-WEIS:  No objection.

17           HEARING OFFICER DUNN:  229 is received.

18  (Employer's Exhibit 229 received)

19  BY MR. LARKIN:

20    Q.  Okay. Mr. Spence, the ALU also had an Instagram

21  page; is that correct?

22    A.  Yes.

23    Q.  During the campaign period?

24    A.  Yes.

25    Q.  And who is responsible for posting content to the

1    ALU's Instagram page?

2       A.  Daniels.

3       Q.  All right. Can we do 386, please? Do you see

4    Employer's Exhibit 386, Mr. Spence?

5       A.  Yes.

6       Q.  And do you recognize it?

7       A.  Not really.

8       Q.  This is not something you've seen before?

9       A.  I recognize that it appears to be a post made by

10   the Amazon Labor Union Instagram, but I don't know that

11   I've seen it before. I don't look at the Instagram that

12   often.

13      Q.  You have any reason to doubt its authenticity?

14      A.  No.

15      Q.  And do you know what the photo is that is

16   depicted in the post?

17      A.  Yes.

18      Q.  Can you tell us what that is?

19      A.  It's a light projection that occurred, I believe,

20   on March 23rd.

21      Q.  All right. Offer 386.

22              HEARING OFFICER DUNN:  Mr. Milner.

23              MR. MILNER:  No objection.

24              HEARING OFFICER DUNN:  Ms. Weis.

25              MS. FRIEDHEIM- WEIS: The witness said he

1  doesn't recognize it. He didn't see it before. But if

2  the Union doesn't have an objection, then the Rd rep

3  won't take a position.

4              HEARING OFFICER DUNN:  All right, 386 is

5  received.

6  (Employer's Exhibit 386 received)

7  BY MR. LARKIN:

8      Q.  I think I want to bring up 2923 Next, please. Mr.

9  Spence, you produced a few videos to us last night, and

10  I want to ask you about them. This -- I believe, 2923 is

11  a screenshot of a video that you produced last night,

12  and I'd like to play the video. Molly, do we have the

13  video? Okay.  So this is 2923-V, which I'll just

14  represent is the video that you produced. 2923 was just

15  a screen grab of it for identification purposes. Can we

16  play this?

17              (Video playing).

18              Mr. Spence, do you recognize the video in

19  exhibit 2923-V.

20      A.  Yes.

21      Q.  And is that a video that you took?

22      A.  Yes.

23      Q.  And when did you do that?

24      A.  I believe, like I said, it was 23rd. The night of

25  the 23rd.

1    Q.  March 23rd, right, 2022?

2    A.  Yes.

3    Q.  And the flashing light up on the side of the

4    building, that was a projection of light, and that was

5    done by a group called the Illuminator, correct?

6    A.  I believe so. I had no part in coordinating the

7    projection.

8    Q.  Do you know who did?

9    A.  That would be Chris Smalls.

10   Q.  So you created the video in 2923-V. Are you aware

11   whether any other of the unions officers -- or well, let

12   me try to use the right term here individuals who hold

13   formal positions from the Union, are you aware whether

14   anyone else besides yourself who holds a formal position

15   with the Union took any other video or images of the

16   light projection?

17            MR. MILNER:  I'm going to object both to the

18   use of the phrase "formal position with the Union" and

19   also to the relevance of the question.

20            HEARING OFFICER DUNN: Mr. Larkin, please

21   rephrase.

22   BY MR. LARKIN:

23   Q.  Well, let's start with the officers. Any officers

24   of the ALU besides yourself, photo or video record the

25   light projections that we're looking at here in 2923-V?

1          MR. MILNER: I still object to the relevance.

2     I don't know what difference it makes if other people

3     took videos of the same thing that we already have in

4     evidence.

5          HEARING OFFICER DUNN:  Mr. Larkin, I'm

6     inclined to agree.

7          MR. LARKIN:  Well, if the answer is yes,

8     then it goes, number one, to subpoena compliance, but

9     number two, it would be probative to Objection 20 and

10     the existence of other relevant evidence.

11          HEARING OFFICER DUNN:  Okay.  I will allow

12     the witness to respond to the extent that he knows.

13     BY MR. LARKIN:

14     A.  I don't know, but I will say that I took up the

15     task of making the recordings for posterity, so it was

16     likely that nobody else saw it necessary to make

17     recordings.

18     Q.  Can we offer 2923 and 2923-V?

19          HEARING OFFICER DUNN:  Mr. Milner?

20          MR. MILNER: Again, it just appears

21     cumulative at this point. I believe these pictures are

22     already in -- video is already in the record as another

23     exhibit. It's just more of the same thing literally.

24          HEARING OFFICER DUNN: Ms. Weis?

25          MS. FRIEDHEIM- WEIS:  I believe it is in the

1  record under another Employer exhibit number, but I

2  don't have it handy, so I have no objection.

3          MR. MILNER:  Again, I know Mr. Larking is

4  going to tell me it's an argument for the brief, but

5  it's also not a captive audience speech because it

6  wasn't and it wasn't within 24 hours of the election in

7  any event.

8          HEARING OFFICER DUNN:  Mr. Larkin, do you

9  know if 2923-v is already in the record as a different

10 exhibit.

11         MR. LARKIN:  Well, that's one of the things

12 I intend to ask Mr. Spence to try to confirm or not for

13 us.

14         HEARING OFFICER DUNN:  Please, Mr. Spence,

15 to the extent you know.

16         THE WITNESS:  Sorry, What is the question.

17         MR. LARKIN:  Well, I would say that

18 regardless of the answer, I'm still going to offer

19 2923-V because I think it's sort of the original image

20 and it's relevant and probative. But let me just take it

21 down for a minute and Molly, let's put 388 up on the

22 screen, please. Okay.

23 BY MR. LARKIN:

24   Q.  So Mr. Spence, 388 is a document that's already

25 been admitted. It is an instagram post from Brett

1   Daniels. It appears to depict the same event that you

2   recorded in 2923-V.  The question that I have to you is

3   the photo that's in the image here in Employer 388, is

4   that an image that you gave to Mr. Daniels or is that an

5   image that's from something separate from what you

6   recorded that evening?

7      A.  I'm going to be honest, I don't know because they

8   all look so similar. I don't know really, just by

9   looking at it, what's mine and what might be somebody

10  else's.

11     Q.  Do you recall whether you provided Mr. Daniels

12  with a copy of the video that we just looked at that was

13  2923-V?

14     A.  I don't recall.

15     Q.  Okay.  So we can take this one down. Okay, so I

16  would offer 2923 and 2923-V. On the basis of Mr.

17  Spence's answers.

18          HEARING OFFICER DUNN:  All right.  I will

19  receive both 2923 and 2923-V. As in Victor.

20  (Employer's Exhibits 2923 and 2923-V received)

21          MR. LARKIN:  Okay.  Can we do 2924, please.

22          MR. MILNER: This is clearly going to be

23  cumulative. I mean, we literally already went through in

24  the tab all of the messages that were put up on the

25  facade of the building. The length of time the messages

1 were displayed, how they rotated, where it came from. I

2 don't know what possible function is served by putting

3 pictures of the same messages on the same facade into

4 evidence all over again.

5          HEARING OFFICER DUNN:  Mr. Larkin, it's

6 true. We already have this image of this message already

7 in the record.

8          MR. LARKIN:  Well, this is just a screen

9 grab of another video that Mr. Spence produced that I'd

10 like him to authenticate.

11          HEARING OFFICER DUNN:  Okay.

12          MR. MILNER:  Your Honor, we don't need more

13 video of the same images being reflected on the facade.

14 What's the difference? There's already been extensive

15 testimony about this, and the testimony is that the same

16 messages were repeated over and over again. So unless

17 the Employer is planning to elicit testimony different

18 than that, I don't know where it is that we're going

19 here other than just cluttering the record and wasting

20 time.

21          HEARING OFFICER DUNN:  I agree except that

22 Mr. Spence did testify that he took it upon himself to

23 make videos, and that based on that, others did not. And

24 so I'm going to allow Mr. Larkin to pursue it based on

25 that testimony.

1              MR. MILNER: I just would like a standing

2    objection then.

3              HEARING OFFICER DUNN: That is granted.

4    BY MR. LARKIN:

5      Q.  Okay.  So let's pull up 2924-V and let's just

6    play it.

7              (Video playing)

8              So Mr. Spence, do you recognize 2924-V?

9      A.  Yeah. If you represent to me that that's a video

10   I submitted, then I trust you, Kurt, because they all

11   look the same.

12     Q.  Well, I certainly appreciate that.  It is a video

13   that you produced last night. So my question to you is,

14   do you recall recording that video?

15     A.  Yeah.  Well, I recall recording videos at the

16   time, and this is one of them.

17     Q.  All right. I'd offer 2924-V.

18             HEARING OFFICER DUNN:  Mr. Milner, Same

19   objection?

20             MR. MILNER:  Yes.

21             HEARING OFFICER DUNN:  Ms. Weis.

22             MS. FRIEDHEIM- WEIS:  It's cumulative, but

23   if the witness can authenticate it, I don't have an

24   objection.

25             HEARING OFFICER DUNN:  Yes, I'm going to

1  receive it based on the testimony of Mr. Spence about

2  videos.

3  (Employer's Exhibit 2924-V received)

4  BY MR. LARKIN:

5    Q.  Okay.  Just a couple more and we'll move on.

6  2925.  And this is, again, a screen grab, Mr. Spence, of

7  a video that you produced to us last night. So that's

8  2925-V let's go ahead and just play it.

9           (Video playing).

10          Okay.  Now, do you recognize 2925-V?

11   A.  Yes.

12   Q.  And is that another video that you created?

13   A.  Yes.

14   Q.  All right, I'd offer 2925 and 2925 -- V

15          HEARING OFFICER DUNN:  Mr. Milner, Same

16 standing Objection?

17          MR. MILNER: Yes.

18          HEARING OFFICER DUNN:  Ms. Weis?

19          MS. FRIEDHEIM- WEIS: No objection.

20          HEARING OFFICER DUNN:  All right, 29 25 and

21 29 25 v. As in Victor are received.

22  (Employer's Exhibits 2925 and 2925-V received)

23  BY MR. LARKIN:

24    Q.  Okay.  And then one more, 2926. Okay. Mr. Spence,

25  this is one more video that you produced to us yesterday

1    evening. The screen grab -- 29 26 is the screen grab.

2    And 2926v is the video. So can we go ahead and play

3    that.

4                (Video playing).

5                And do you recognize 2926-V?

6    A.  Yes.

7    Q.  And is that another video that you created?

8    A.  Yes.

9    Q.  All right.  So I would offer 2926 and 2926-V.

10               HEARING OFFICER DUNN:  Mr. Milner, same

11   standing objection?

12               MR. MILNER:  Yes, Your Honor.

13               HEARING OFFICER DUNN:  All right, Ms. Weis.

14               MS. FRIEDHEIM- WEIS:  I actually just have a

15   voir dire because I think I might have lost my train of

16   thought, if I may.

17               HEARING OFFICER DUNN:  Yes, please.

18               MS. FRIEDHEIM- WEIS:  Mr. Spence., As I

19   said, I might have lost my train of thought. These last

20   few videos that you were identifying, were these videos

21   that you posted on Instagram.

22               THE WITNESS:  I don't post things to the

23   Instagram, so they might have been posted elsewhere and

24   then made their way to Instagram. That's all I know.

25               MS. FRIEDHEIM- WEIS:  Do you know what you

1  did with these last two, three, four, five videos that

2  you were shown.

3          THE WITNESS: I think primarily they were

4  compiled to make a TikTok.  So if they were posted to

5  TikTok, they might have made their way to Instagram or

6  Twitter or somewhere else.

7          MS. FRIEDHEIM- WEIS:  None of this goes to

8  Objections one through twelve, but hearing what the

9  witness just said, I'm not really satisfied that there's

10  sufficient foundation for any of them, because I'm not

11  sure where they appeared, so I have that concern.

12          HEARING OFFICER DUNN:  Okay, that's noted. I

13  will receive 29 26 and 29 26 v. As in Victor.

14  (Employer's Exhibits 2926 and 2926-V received)

15  BY MR. LARKIN:

16    Q.  Mr. Spence did the ALU during the campaign period

17  have a TikTok account?

18    A.  Yes.

19    Q.  And who was responsible for posting content

20  during the campaign period to the TikTok account?

21    A.  I was.

22    Q.  Anybody else beside you?

23    A.  So I had the credentials to log in. There were

24  people who were better at editing than I was, who helped

25  me put the TikToks together, but I had the final

1   approval over the content and what was inevitably

2   posted.

3       Q.  Okay.  So I want to ask you about a couple of

4   those. Can we do 385? 385 is a slip sheet for the video,

5   so let's pull that up.

6                   (Video playing)

7                   Do you recognize 385?

8       A.  Yes.

9       Q.  Actually, I think we've labeled it 385-V. Just to

10  be accurate. For the record, is that a TikTok that you

11  posted to the ALU's TikTok account?

12      A.  Yes.

13      Q.  And do you recall when you posted it?

14      A.  I don't.

15      Q.  It would have been some time after those events

16  were filmed, correct?

17      A.  Yes. After the March 23rd projection, probably

18  shortly thereafter.

19      Q.  I would move the admission of 385 at this time?

20                  HEARING OFFICER DUNN:  Mr. Milner, anything

21  beyond your standing objection.

22                  MR. MILNER:  Well, yeah, I mean, it's

23  cumulative. I mean, that is clearly just a rehash of the

24  other videos we law cut off and edited and put together.

25  So we're just now putting the evidence in for a third

1  time.

2          HEARING OFFICER DUNN:  Ms. Weis.

3          MS. FRIEDHEIM- WEIS:  I can't recall exactly

4  if it's the same video as Employer Exhibit 716. I

5  believe that was put in or attempted to be put in

6  through Brett Daniels. If it is, I would object that

7  it's just the same exhibit under a different number. If

8  not, I have no objection.

9          HEARING OFFICER DUNN: Mr. Larkin, do you

10 know, is it the same as 716?

11         MR. LARKIN:  Let me just check on that.

12         HEARING OFFICER DUNN:  Thanks.

13         MR. LARKIN:  I don't believe it is. No.

14         HEARING OFFICER DUNN:  Okay. I'm going to

15 receive 385 V, as in Victor, consistent with the Mr.

16 Spencer's testimony that the videos I received involving

17 the projection were used for the purpose of the TikTok.

18 (Employer's Exhibit 385-V received)

19 BY MR. LARKIN:

20   Q.  You can take that off, Molly. And I want to do

21 something. I'm going to share my screen. So Mr. Spence,

22 I'm sharing my screen, and it should be, if I've done it

23 right --

24         HEARING OFFICER DUNN:  A picture of a golf

25 course?

1        MR. LARKIN:  No, it shouldn't be that. Let's

2   see. Oh, how about that? No?    Yes?

3        HEARING OFFICER DUNN: -- exhibits I think.

4        MR. LARKIN:  Yeah. What I'm trying to

5   display is the ALU's TikTok page as it currently lives

6   out on the internet.

7   BY MR. LARKIN:

8   Q.  All right. Do you see that?

9   A.  Yes.

10  Q.  Okay.  So I'm going to click on a TikTok post,

11  and I'm going to represent that It's the same thing that

12  we just saw on exhibit 385 V, and weDon'T need to watch

13  it. My only question to you, Mr. Spence, is whether

14  seeing the TikTok post that the video of which we've

15  entered in the record is 385 V. Does it refresh your

16  recollection as to when you posted it?

17  A.  So I got to move the Zoom stuff out of the way.

18  Well, I can see that there's a date on there that says

19  March 24th.

20  Q.  Does that sound accurate as far as when you would

21  have posted this video?

22  A.  Yeah.  Like I said, it was after the 23rd.

23  Shortly thereafter.

24  Q.  Okay. And we should have made that part of the

25  screen grab, but for whatever reason, we did not. So I

1    just wanted to clarify that. All right. There are a few

2    more of those of these that I want to ask you about. I

3    just want to make sure that they're not already admitted

4    or rejected before I do. Yeah, I don't think they are.

5    So let's do 716. So for the rest of these, Mr. Spence,

6    the way I think we will have set this up is that there

7    will be a screen grab that actually shows the entire

8    TikTok post and then the video behind it. So I'm showing

9    you the screen grab of a TikTok post made to the ALU's

10   TikTok account on appears to be March 28th. And then

11   there's a video embedded. I'd like to play the video.

12   It's 716-V.

13              (Video playing)

14              So question first, Mr. Spence, do you

15   recognize 716 -- And you can take that off the screen.

16   A.   Yeah.

17   Q.   Is that a TikTok that you posted on March 28th of

18   2022?

19   A.   Yes.

20   Q.   Okay. And question that I have about it is the

21   video that is posted, did you make that video?

22   A.   I was assisted with making it, but like I said,

23   the final authority of posting and determining what the

24   content of a video should be is mine.

25   Q.   Okay. And what date were the various images in

1   the video filmed?

2       A.  That I don't know. It seems to depict us giving

3   out food in the break room, which, as you know, we did

4   on many occasions. I don't know which one specifically.

5       Q.  Okay. And also, in the video, it depicted, I

6   believe, on the table, the giving out of the ALU

7   lanyard. Did you see that?

8       A.  Yeah.

9       Q.  When did the Union begin to distribute those

10  During the campaign?

11      A.  Possibly in late February through the end of the

12  campaign.

13      Q.  Okay.  So then the events in the video could have

14  been filmed anytime between late February and March

15  28th?

16      A.  Yeah.

17      Q.  Okay. I'd offer 716 at this time.

18              HEARING OFFICER DUNN:  Mr. Milner.

19              MR. MILNER:  I object to the relevance

20  unless I missed something in that video. As Mr. Spence

21  testified, it doesn't really show anything other than

22  workers taking food that it was provided to them for

23  free. Which is not an Objection and is not objectionable

24  contact under any interpretation of the law.

25              HEARING OFFICER DUNN:  Ms. Weis.

1          MS. FRIEDHEIM- WEIS:  Since Mr. Spence

2     either took or formulated the TikTok, I don't have an

3     issue with that. My issue would be to redact the faces

4     of non officers as they were engaging in Section 7

5     rights.

6          MR. MILNER:  I was going to add that as

7     well, but thank you.

8          MS. FRIEDHEIM- WEIS:  Or Section 7 activity,

9     I should say.

10          HEARING OFFICER DUNN: And Mr. Larkin, I just

11     have a question. I know we viewed that video, or at

12     least it looks awfully familiar to me. Are you sure that

13     is not an exhibit that has already been rejected.

14          MR. LARKIN:  Yes and yes. We introduced this

15     video with Mr. Anthony, and he was unable to say who

16     created it, so I didn't offer it at that time.

17          HEARING OFFICER DUNN:  I see. Okay. And then

18     I'm going to allow you to respond to the arguments made

19     by both Mr. Milner and Ms. Weis.

20          MR. LARKIN:  Well, I would just say that

21     there are some images in the video that I believe are

22     relevant to agency status. I also believe that some of

23     the images in the video are relevant to Objection 10.

24     Anything further than that we'd have to excuse Mr.

25     Spence.

1          MR. MILNER:  I am particularly curious how

2    the video could have anything to do with Objection 10.

3    Maybe we should excuse the witness.

4          HEARING OFFICER DUNN:  Mr. Spence, if you

5    would leave the room. Thank you.

6          (Witness leaves videoconference)

7          And Mr. Milner, please confirm that he has.

8          MR. MILNER:  Sure. Yep. Okay.

9          HEARING OFFICER DUNN:  Mr. Larkin, you were

10   saying.

11         MR. LARKIN:  Well, I mean, the video

12   corroborates the distribution of the ALU's vote Yes

13   Lanyard and that's all? I'm only offering it for that

14   purpose. There's been testimony about the presence of

15   lanyards in the voting area. And so, this video simply

16   corroborates the fact that they were distributed during

17   the campaign period.

18         MR. MILNER:  No one has denied that the ALU

19   was distributed. Lanyards this is a non issue.

20         MR. LARKIN:  I believe Ms. Maldonado denied

21   it yesterday.

22         HEARING OFFICER DUNN:  Ms. Weis -- I'm

23   sorry, Mr. Milner. Go ahead.

24         MR. MILNER: I mean, the record will speak

25   for itself, but I do not believe Ms. Maldonado denied

1    the Union giving out lanyards during the campaign

2    period. I think she denied giving out lanyards during

3    the time frame of March 25 to March 30, which she

4    mistakenly referred to as the election period.

5              HEARING OFFICER DUNN:  That is my

6    recollection of what Ms. Maldonado's testimony was. Ms.

7    Weis, go ahead.

8              MS. FRIEDHEIM- WEIS:  Yeah.  That's my

9    recollection of Ms. Maldonado's testimony as well. But

10   more importantly, up to now, I had had no issue with Mr.

11   Spence confirming that he made this TikTok, and I don't

12   think it was Mr. Anthony. It doesn't really matter. In

13   my notes, it was shown to Mr. Daniels, and since he

14   didn't take it, he couldn't confirm it, and Amazon moved

15   on. And up to now, I had no issue with it going in, for

16   whatever it's worth. But as to Objection 10, the fact

17   that ALU had lanyards on a table has nothing to do with

18   what the Board did or did not allow during the election.

19   The TikTok doesn't show the election, and it's

20   completely and wholly irrelevant to anything that

21   happened at the election.

22             HEARING OFFICER DUNN:  Yes, I find that

23   Employer 716 is irrelevant to any of the Objections

24   before me, including Objection 10.

25             MR. LARKIN:  All right, so we'd offer it

1    into the rejected exhibits file.

2              HEARING OFFICER DUNN: And that is granted.

3    (Employer's Exhibit 716 received)

4              MR. LARKIN: Before we bring Mr. Spence back,

5    I would proffer 719, which is another TikTok that I'd

6    ask him to authenticate. Can we pull that up, and then

7    can we play the video.

8              (Video playing)

9              MR. MILNER: My objections are the same to

10   this video.

11             HEARING OFFICER DUNN:  Yes.  And I think

12   that I would make the same ruling as I just made with

13   716 reject on the basis of relevance.

14             MR. LARKIN:  Okay. I just wanted to confirm

15   something very quickly. Okay, so we would offer that 719

16   719 V into the rejected file.

17             HEARING OFFICER DUNN: That's granted.

18   (Employer's Exhibits 719 and 719-v received in rejected

19   exhibits file)

20             MR. LARKIN:  Okay. And I think we can bring

21   him back.

22             MR. MILNER: Think he might be in the

23   restroom.  Let me check.

24             HEARING OFFICER DUNN: Let's briefly go off

25   the record while Mr. Milner checks.

1                    (Off the record

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25