UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X
DR. BRIMA SYLLA, *et al.*,

      Plaintiffs,

    -against-

AMAZON LABOR UNION and CHRIS
SMALLS, as President of the Amazon
Labor Union,

      Defendants.
------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
23-CV-5261 (AMD) (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

  On July 10, 2023, a group of 41 Plaintiffs, members of Defendant Amazon Labor Union (the "ALU" or the "Union"), filed a complaint, seeking an injunction compelling Defendants ALU and its then-president, Chris Smalls (collectively, "Defendants"), to hold a union officer election and "to then conduct it democratically," under Sections 101 and 609 of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 411, 529.[1] Compl., ECF 1, ¶ 1; *see generally id.*; Am. Compl., ECF 9. After months of litigation and a nearly eight-hour settlement conference before the undersigned Magistrate Judge, the parties filed a consent order, governing the terms by which a democratic union election would be held, which the Honorable Ann M. Donnelly entered on January 10, 2024. *See* Dec. 8, 2023 ECF Min. Entry & Order (reporting that an

---

[1] Plaintiffs' complaint states that it is bringing claims under "Section 101(a)(1) of the LMRDA, 29 U.S.C. Sec. 101(a)(1)" and "Section 101(a)(2) of the LMRDA, 29 U.S.C. Sec. 101(a)(2)." Compl., ECF 1, ¶¶ 78, 80; *see also* Am. Compl., ECF 9, ¶¶ 78, 80. The Court notes that the section of the United States Code corresponding to Section 101 of the LMRDA is located at 29 U.S.C. § 411, and thus construes Plaintiffs' complaint accordingly. *Cf.* 29 U.S.C. § 101 (provision of the Norris-LaGuardia Act).

agreement in principle was achieved at the settlement conference); Joint Letter, ECF 45 (requesting that the court enter the proposed consent order filed at ECF 45-1); Consent Order, ECF 46 (entering consent order).

Following further litigation, as well as the ALU's affiliation with the International Brotherhood of Teamsters ("IBT" or the "Teamsters"), an election was held in July 2024. *See* Pls. Letter Mot., ECF 84. As a result, some of the individuals who initially brought the suit became officers of Defendant ALU; for example, Plaintiff Connor Spence assumed the role of president, which had previously been held by Defendant Chris Smalls. *See* Schwartz Decl., ECF 84-1; Certification of Election Results, ECF 84-2.

Presently before the Court is Plaintiffs' counsel's motion for attorney's fees, which Defendants oppose. Pls. Mot. for Att'y's Fees ("Fees Mot."), ECF 92. For the following reasons, the Court respectfully recommends denying the motion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. ALU Formation & Organizing Drive: Fall 2021 – Spring 2023

Plaintiffs are present and former workers at Amazon's JFK8 fulfillment center ("JFK8"), located in Staten Island, New York. *See* Am. Compl., ECF 9, ¶ 3. As alleged in Plaintiffs' amended complaint, in April 2021, JFK8 workers, including Plaintiff Spence and Defendant Smalls, began an organizing drive among their colleagues with the goal of forming a union of Amazon employees at JFK8; this drive was ultimately successful, with the National Labor Relations Board ("NLRB") certifying the results of the election on January 12, 2023. *Id*. ¶¶ 6–10, 17–33, 66. Defendant Smalls was to be the ALU's first president, while Plaintiff Spence was initially elected Interim Vice President of Membership. *Id.* ¶ 15.

Per the amended complaint, the first ALU constitution was ratified on October 17, 2021. *Id.* ¶ 10. In June 2022, ALU leadership revised this constitution, in consultation with counsel; this constitution (the "Second Constitution") would have required a leadership election in 2024 or "60 days after certification of the results of the representation election, whichever comes first." *Id.* ¶¶ 34–39. *But see* Mirer Decl., ECF 98-1, ¶¶ 11–14 (disputing whether the Second Constitution "had ever been adopted"); Palmer Decl., ECF 98-2, ¶¶ 8–10 (describing the process of amending the constitution). Following the revision of the constitution, Plaintiffs allege that "internal union disagreements" came to a head; in the main, these centered around "a common grievance . . . that the [U]nion was undemocratic." Am. Compl., ECF 9, at 10 (capitalization modified), ¶ 54; *see id.* ¶¶ 47–59. A third constitution was adopted, without a vote of the membership, on December 9, 2022. *Id.* ¶¶ 60–64. This constitution set the timing for an officers' election for three months after the ALU ratified a collective bargaining agreement with Amazon — "a date which could be years into the future," if it ever occurred.[2] *Id.* ¶ 63(a).

Following this meeting, a number of the plaintiffs founded a reform caucus and circulated a petition to amend the Union's constitution. *Id.* ¶¶ 65, 71. Plaintiffs allege that members of the reform caucus, such as Plaintiffs Sylla and Cioffi, were excluded from general union meetings "due to [their] association with Spence and the reformists." *Id.* ¶ 68; *see id.* ¶ 69. Cioffi was "told that his union membership was revoked," and his access to ALU attorneys for assistance with a separate NLRB charge

---

[2] To date, the ALU has not begun to bargain with Amazon. *See* Palmer Decl., ECF 98-2, ¶ 22; *see also Amazon.com Servs. LLC v. Nat'l Lab. Rels. Bd.*, 151 F.4th 221, 224–26 (5th Cir. 2025) (summarizing the history of Amazon's challenge to the NLRB's charge seeking an order requiring Amazon to bargain with the ALU).

was terminated. *Id.* ¶ 68. Plaintiffs further allege that Defendant Smalls "threatened Sylla and all other reform caucus organizers . . . with legal action for false representation of a government-certified union." *Id.* ¶ 70. Plaintiffs circulated another petition, "calling for a membership meeting to vote on restoring the last properly adopted set of bylaws," which would have set an officer's election into motion, while simultaneously scheduling a mediation session in an effort to resolve the dispute without litigation. *Id.* ¶¶ 71–72.

In late June 2023, "Plaintiffs were notified that the ALU Executive Board had declined mediation," and accordingly, sought judicial intervention to obtain "a fair and democratic election." *Id.* ¶¶ 73, 75.

## II. The Instant Litigation: Summer – Fall 2023

As noted above, Plaintiffs filed the complaint in this case on July 10, 2023. *See* Compl., ECF 1. That same day, Plaintiffs filed a motion for a temporary restraining order ("TRO") and preliminary injunction, seeking to enjoin Defendants from "governing [the] ALU pursuant to the Amended Constitution adopted in or about December[] 2022," rather than the June 2022 Amended Constitution, and directing Defendants to hold an election by August 30, 2023. Mot. for Order to Show Cause, ECF 2. On July 11, 2023, Plaintiffs filed an amended complaint, which brought the number of Plaintiffs in the case to over 80. *See* Am. Compl., ECF 9. Also on July 11, 2023, Judge Donnelly scheduled a hearing on the TRO for July 13, 2023. *See* July 11, 2023 ECF Order. During the July 13, 2023 TRO hearing, Judge Donnelly denied Plaintiffs' request for a TRO, holding that Plaintiffs "make only vague [and] conclusory allegations" and "do not establish an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." July 13, 2023 ECF

Min. Entry & Order (alteration in original). Plaintiffs were directed to move for a preliminary injunction by August 14, 2023. *Id.* That did not happen.

On August 1, 2023, Defendants requested a pre-motion conference ahead of an anticipated motion to dismiss, and on August 14, 2023, Plaintiffs requested leave to file a second amended complaint. *See* Defs. Mot. for Pre-Mot. Conference, ECF 22; Pls. Mot. to Amend Compl., ECF 26. After Defendants requested that any amended complaint or preliminary injunction motion be filed under seal, Plaintiffs filed a letter requesting a settlement conference before the undersigned Magistrate Judge. Defs. Resp. to Mot., ECF 28; Pls. Letter, ECF 30. Plaintiffs' deadlines for the second amended complaint and preliminary injunction were extended to follow the settlement conference, which was scheduled for December 8, 2023. *See* Oct. 20, 2023 ECF Scheduling Order.[3]

After hours of negotiations, the settlement conference was successful. The parties achieved "an agreement in principle . . . on how to move forward as a unified union,

_____

[3] Prior to this settlement conference, on November 7, 2023, Defendants filed a motion to disqualify counsel Arthur Schwartz, which Judge Donnelly referred to the undersigned. Defs. Mot. to Disqualify Counsel ("Disqualification Mot."), ECF 31; Nov. 9, 2023 ECF Order Respectfully Referring Mot. Defendants' argument centered on an allegation that Mr. Schwartz had been retained by Michelle Valentin Nieves, who had previously been an officer of Defendant ALU (and thus had access to privileged information), prior to her "join[ing] the Reform Caucus" and "support[ing] their litigation." Disqualification Mot., ECF 31, at ECF p. 2 (quotation marks omitted); *see also* Nieves Decl., ECF 18 (disputing Plaintiffs' characterization of the June 2022 meeting regarding the Second Constitution). Plaintiffs opposed the motion in a letter filed under seal. *See* Pls. Resp. in Opp'n, ECF 34. Later, Plaintiffs' counsel averred that he "do[es] not, and will not, while this litigation is pending, represent Ms. Nieves." Pls. Letter, ECF 42. Although Defendants ultimately withdrew their motion following the settlement conference, Ms. Nieves later filed a motion to intervene, contending that she was entitled to relief on the basis of Defendants' "non[-]compliance [with] the Constit[u]tion and bylaws." Mot. to Intervene, ECF 49; *see* Dec. 21, 2023 ECF Min. Entry & Order (confirming withdrawal of the disqualification motion); *see also* Mem. Decision & Order, ECF 74 (denying Ms. Nieves's and three other *pro se* motions to intervene).

While this episode is not directly relevant to the core issues at play in the instant motion for attorney's fees, the Court recounts it to illustrate both the highly contentious nature of the litigation and the fluid nature of the boundaries on both sides of the v. in this case.

including the scheduling of a member meeting and an election of officers." Dec. 8, 2025 ECF Min. Entry & Order. The parties were directed to finalize a "unity statement and consent decree," the former of which would be issued publicly and the latter of which would be filed with the court. *Id.*; *see* Proposed Consent Order, ECF 45-1; *id.* ¶ 3 (indicating that the parties published the unity statement). On January 5, 2024, the parties submitted their finalized proposed consent order, and on January 10, 2024, Judge Donnelly ordered it. *See* Pls. Letter, ECF 45; Consent Order, ECF 46.

### III. The Consent Order & Further Litigation: Winter 2023 – Spring 2024

The consent order is just five pages long. It stipulates that Plaintiffs — by now called the "Democratic Caucus of the Amazon Labor Union" (the "Caucus") — and Defendants recognize that "continuing the litigation prevents all parties from uniting to work towards a good contract" for JFK8 workers, and, in support of that goal, "the parties have committed to work together . . . [by] giving the members of the union a say in whether to hold various elections." Consent Order, ECF 46, ¶¶ 1, 2; *see also id.* ¶ 3. The parties further agreed not to make "public statements . . . critical of the other" and address disagreements "on the merits and not as public personal attacks on various persons or union leaders." *Id.* ¶ 4. The parties also agreed to "reintegrate" Caucus members into "the union's representation mechanisms" and to hold a mass member meeting in February 2024, to discuss updates, "whether to hold elections for new officers," and "whether to elect a constitution committee to propose updating and amending the Union's constitution." *Id.* ¶¶ 5, 6, 9.

The consent order laid out processes by which the meeting and any resulting vote would be accessible to as many workers as possible. *See id.* ¶¶ 7–18, 21. It also called for the appointment of a neutral monitor to oversee the meeting, the voting, and any related disagreements between the parties. *Id.* ¶¶ 15–16, 19–20, 22. The order

proposed timing for any elections resulting from the meeting and the roles to be elected, and contemplated a pause in the agreement in the event of active bargaining with Amazon. *Id.* ¶¶ 23–25.

The parties appointed Richard Levy, a longtime union attorney, as the neutral monitor. *See* Joint Letter, ECF 47; Pls. Letter, ECF 48. The mass meeting was held from February 27, 2024, through March 2, 2024, resulting in a vote in favor of holding an election. *See* Schwartz Decl., ECF 62-1, ¶¶ 8–9. But the path to the election was not smooth. On April 14, 2024, the parties filed competing letters, representing opposite views on the potential impact of the then-pending motions to intervene on the elections process and consent order. *See* Defs. Letter, ECF 60; Pls. Letter, ECF 61. On April 18, 2024, Plaintiffs moved for an All Writs Act order, seeking to compel Amazon (a non-party to this litigation) to provide the names and addresses of workers who would be eligible to vote in the union officers' election, and to allow employees running for office access to the areas outside the front entrance and the break rooms at JFK8. All Writs Act Mot., ECF 62. Following a hearing on Plaintiffs' All Writs Act petition, Judge Donnelly reminded the parties that "they are bound by the [] Consent Order, which explicitly states that any disagreements . . . will be resolved by the neutral monitor." Apr. 25, 2024 ECF Min. Entry & Order (quotation marks omitted). Defendants also served a Rule 45 subpoena on Amazon, relying on the consent order for authority, which Amazon moved to quash. Mot. to Quash, ECF 71; Amazon Letter, ECF 65; *see id.* at 3. Judge Donnelly ultimately granted Plaintiffs' All Writs Act motion in relevant part, requiring Amazon to provide the names and addresses of JFK8 employees to the neutral monitor so that the election could be held. *See* Mem. Decision & Order, ECF 75, at 12–14. Judge

Donnelly also granted Amazon's motion to quash the Rule 45 subpoena but denied Amazon's motion for a protective order. *See id.*, at 8–9.[4]

**IV. The Teamsters Affiliation, Elections, and Dismissal of This Case: Summer – Fall 2024**

In the background, the ALU and the Teamsters were discussing a possible affiliation in order to "combine the strengths of the IBT and the ALU." *See* Suetholz Decl., ECF 98-3, ¶ 17; *see id.* ¶¶ 11–17. On June 3, 2024, the ALU affiliated with the Teamsters, creating a new local, ALU-IBT Local 1, formally under the umbrella of the Teamsters. *Id.* ¶¶ 18–19. Per the terms of the parties' affiliation agreement, the "'ALU and IBT are responsible for their respective debts, liabilities, and all other obligations, and neither ALU nor IBT shall be responsible for the debts, liabilities, or obligations of the other.'" *Id.* ¶ 21 (quoting Affiliation Agreement, ECF 98-3, at ECF p. 8).

The election ultimately took place on July 30, 2024, and the results were certified on August 8, 2024: Plaintiff Spence was elected President, Plaintiff Sylla was elected Vice President, and 11 individuals, including Plaintiffs Martinez, Cioffi, Medina, Sherwood, and Mohan, were elected to the constitution committee. Certification of Election, ECF 84-2; *see* Letter Mot. for J. Based on Settlement, ECF 84; Schwartz Decl., ECF 84-1. The Teamsters shouldered the costs of this election; by that point, the ALU "[did] not exist anymore and [had] no assets." Suetholz Decl., ECF 98-3, ¶¶ 24–25.

---

[4] Judge Donnelly later denied Plaintiffs' request for attorney's fees accrued in connection with Amazon's motion for reconsideration of this order, observing that Plaintiffs' fees request did not contain the requisite degree of specificity for an award based on bad faith. Oct. 7, 2024 ECF Order; *see* Pls. Resp. in Opp'n, ECF 77, at 5 (requesting attorney's fees in light of "inappropriate content" contained within the motion to reconsider). The Court notes that Plaintiffs' instant fee motion requests 4.1 hours' worth of fees in connection with the motion for reconsideration. *See* Billing Records, ECF 92-2, at 3 (entries dated May 12, 2024, through May 13, 2024).

On August 11, 2024, Plaintiffs filed a motion styled as a motion for judgment based on settlement, requesting that the court certify the election, discontinue the case, and set a schedule for an attorney's fee application, which Judge Donnelly referred to the undersigned.[5] Letter Mot. for J. Based on Settlement, ECF 84; Aug. 26, 2024 ECF Order Respectfully Referring Mot. At a hearing before the undersigned, Plaintiffs confirmed that they no longer sought an order certifying the election, but would move to discontinue the case and seek attorney's fees; Defendants agreed that the case should be discontinued, but opposed any fee application. Oct. 16, 2024 ECF Min. Entry & Order. Accordingly, the Court terminated the motion for judgment as moot, directed Plaintiffs' counsel to move for discontinuance, and encouraged the parties "to discuss whether the question of attorney's fees can be resolved by agreement or settlement." *Id.*

On October 16, 2024, Plaintiffs filed a consent motion to dismiss the action and "set[ an] attorney[']s fee application schedule," which Judge Donnelly entered on November 22, 2024. Proposed Order, ECF 89-1; Order, ECF 90. The order stipulated that "Plaintiffs' Counsel ha[d] leave to file an application for attorney[']s fees" within 60 days of entry of the order, a deadline which was later extended. Order, ECF 90, at 2; Feb. 4, 2025 ECF Order (extending the time to file the attorney's fee application to March 22, 2025).

## V.  The Attorney's Fees Motion: Spring 2025 – Present

On March 24, 2025, Arthur Schwartz, counsel for Plaintiffs, filed a motion for attorney's fees, arguing that Plaintiffs are entitled to a fee award under the common

---

[5] Federal Rule of Civil Procedure 54(d)(2)(D) expressly provides that the court "may refer a motion for attorney's fees to a magistrate judge under Rule 72(b) as if it were a dispositive pretrial matter."

benefit doctrine because their litigation seeking an election resulted in a consent order facilitating that election, benefitting the entire membership of the ALU. *See generally* Mem. in Supp. of Mot. for Att'y's Fees ("Pls. Mem."), ECF 92-3, Fees Mot., ECF 92; *see also* Schwartz Decl., ECF 92-1, ¶¶ 2–3. Mr. Schwartz further argued that any fee award should be ordered payable by the ALU-IBT Local 1. Pls. Mem., ECF 92-3, at 1; *see* Schwartz Decl., ECF 92-1, ¶ 10. Counsel requested $132,738.75, representing 196.65 hours of work billed at $675 per hour. *See* Schwartz Decl., ECF 92-1, ¶ 7; *see also* Billing Records, ECF 92-2.

As anticipated, Defendants opposed the motion. *See* Defs. Mem. in Opp'n ("Defs. Mem."), ECF 95. Defendants argued, *inter alia*, that not only were Plaintiffs not successful litigants in the sense contemplated by the common benefit doctrine, but also that it would not be equitable to "raid the union treasury to pay legal fees" given that "the Union agreed not to charge the workers any union dues until such time as they secured a collective bargaining agreement," and the Union "may not use money from the Teamsters" to pay any fee request. *Id.* at 9 (capitalization modified). Defendants further contended that Mr. Schwartz's failure to provide his retainer agreement made his application deficient, and speculated that if "his pay for successfully backing the dissident slate of candidates [would be] to become the union's general counsel," then his actions "appear self-interested rather than seeking to vindicate [Plaintiffs'] rights." *Id.* at 8–9. Mr. Schwartz objected to these statements as "hearsay." Reply, ECF 96, at 3; *see* Schwartz Reply Decl., ECF 96-1, ¶ 3.

On October 21, 2025, Judge Donnelly referred the attorney's fee motion to the undersigned. *See* Oct. 21, 2025 ECF Order Respectfully Referring Mot. That same day, the Court directed Mr. Schwartz to file supplemental briefing, (1) clarifying his assertions that his retainer agreement consisted of "'a list signed'" by putative Plaintiffs,

(2) explaining whether Mr. Schwartz has been paid for his work on this case, and (3) submitting "any additional evidence or authority in support of the proposition that the fee award should be 'made payable by ALU-IBT Local 1,' apparently as a successor in interest to the Amazon Labor Union." Oct. 21, 2025 ECF Order (quoting Schwartz Decl., ECF 92-1, ¶ 10).

In response, Mr. Schwartz averred that (1) he had agreed not to charge Plaintiffs a fee, and instead would seek fees from the Union if successful; (2) he has not received payment from anyone "for the work done, or for the expenses laid out in this case"; and (3) "the Amazon Labor Union affiliated with the Teamsters Union before the election occurred. . . . Part of the agreement was that it change its name to ALU-IBT Local 1. It did not dissolve, nor did it change its constitution, nor was there a 'new' entity." Schwartz Suppl. Decl., ECF 97, ¶¶ 3, 8, 9. Defense counsel's reply in opposition included the declaration of David Suetholz, the General Counsel of the Teamsters, in which he stated, under penalty of perjury, that the Teamsters agreed to pay Mr. Schwartz's attorney's fees "in an action against the New York City police for interference with the workers['] rights" during a December 2024 strike "'to compensate him for his effort on behalf of the ALU-IBT Local 1 officers including Connor Spence and Brima Sylla,'" and asked Mr. Schwartz "'not to continue seeking the fees from IBT or ALU-IBT Local 1.'" *See* Defs. Suppl. Opp'n, ECF 98, at 10 (quoting Suetholz Decl., ECF 98-3, ¶¶ 26, 27). Mr. Suetholz's declaration further states that "[i]n return for the IBT hiring him to do the case regarding police interference, [Mr. Schwartz] stated to [him] that he was *not* going to pursue fees in this matter." Suetholz Decl., ECF 98-3, ¶ 27.

On January 13, 2026, Mr. Schwartz submitted a second supplemental declaration in reply, substantially reiterating his prior positions and asserting that he "never

waived fees in return for pursuing a lawsuit vs. Amazon" and that any discussions regarding "a way to get paid for [his] work on the election case without a fee award" never concluded. *See* Schwartz Second Suppl. Decl., ECF 101, ¶¶ 9–10. To this declaration, he attached copies of the ALU's 2022 and 2023 LM-2 forms, which reported that the union received over $857,000 and $669,000 in 2022 and 2023, respectively; Mr. Schwartz asserts that "[t]hat money stopped coming in because of the undemocratic activities of" Defendant Smalls. *Id.* ¶ 12; *see also* 2022 ALU LM-2, ECF 101-3, at ECF p. 4 (representing that, in 2022, the union took in $40 in dues and agency fees, $15,151 from the sale of supplies, and $842,218 in other receipts, for a total of $857,409); 2023 ALU LM-2, ECF 101-4, at ECF p. 4 (reporting $735 in dues and agency fees, $53,013 for sale of supplies, and $616,150 in other receipts, for a total of $669,898 in 2023).[6]

## DISCUSSION

### I. Applicable Law

It is well settled that courts generally do not award attorney's fees to a prevailing party absent statutory or contractual authority. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 602 (2001); *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.* ("*ACTWU*"), 54 F.3d 69, 71 (2d Cir. 1995). Rather, the default "American" rule is that parties pay their own litigation expenses. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 776 F.2d 383, 390 (2d Cir. 1985).

---

[6] Mr. Schwartz did not append the ALU's 2024 LM-2 form, but the Court was able to locate it through a search of the Department of Labor's Office of Labor-Management Standards' public records. *See generally* Schwartz Second Suppl. Decl., ECF 101; *see* ALU 2024 LM-2 Form, https://olmsapps.dol.gov/query/orgReport.do?rptId=918175&rptForm=LM2Form [https://perma.cc/HM58-4UEX] (noting $0 in dues and agency fees and $12,115 in other receipts, for a total of $12,115 for the period of January 1, 2024, through June 17, 2024, and $0 in total assets at the end of the reporting period); *see also Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (observing that courts may take judicial notice of "documents retrieved from official government websites" and collecting cases).

One exception to the default rule is the common benefit doctrine, which allows "a prevailing party to obtain reimbursement" of attorney's fees "'where the litigation has conferred a substantial benefit on the members of an ascertainable class,' and where it is possible to spread the costs proportionately among the members of the class." *ACTWU*, 54 F.3d at 71 (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392 (1970)). Whether a plaintiff merits an award of attorney's fees is a question of fact within the district court's discretion, and requires a balancing of interests. *Rodonich v. Senyshyn*, 52 F.3d 28, 33 (2d Cir. 1995). Specifically, the court should "appraise the need for and potential benefits derived from the attorney's services, based on the judge's personal observation of counsel's performance and [her] intimate familiarity with the case." *Rosario v. Amalgamated Ladies' Garment Cutters' Union, Loc. 10, I.L.G.W.U.*, 749 F.2d 1000, 1004 (2d Cir. 1984).

The LMRDA does not expressly provide for fee shifting for claims brought under Title I, such as Plaintiffs' claims here. *See generally* 29 U.S.C. § 411 *et seq*. Accordingly, motions for attorney's fees in cases brought under Title I of the LMRDA are often evaluated under the common benefit doctrine. *See Hall v. Cole*, 412 U.S. 1, 5–7 (1973); *Rodonich*, 52 F.3d at 31–33. It is not necessary for the court to find that the LMRDA was violated to find that a party is entitled to attorney's fees under a common benefit theory. *Stokely v. George*, No. 05-CV-2051 (GBD) (HBP), 2006 WL 2807161, at *2 (S.D.N.Y. Sept. 28, 2006). Rather, the common benefit rule is an equitable doctrine, seeking to avoid the unjust enrichment of individuals who obtain a benefit of a lawsuit without contributing to its cost. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *ACTWU*, 54 F.3d at 71. It is undergirded by a "policy of encouraging lawsuits to vindicate important rights that

otherwise might not be vindicated." *New Leadership Comm. v. Davidson*, 23 F. Supp. 2d 301, 305 (E.D.N.Y. 1998) (citing *Rodonich*, 52 F.3d at 32–33).

A party "prevails" for the purpose of an attorney's fee award when "a court conclusively resolves a claim by granting enduring judicial relief on the merits that materially alters the legal relationship between the parties," and such relief is "judicially sanctioned." *Lackey v. Stinnie*, 604 U.S. 192, 203–04 (2025); *see Perez v. Westchester County Dep't of Corrections*, 587 F.3d 143, 149 (2d Cir. 2009) (holding that a party prevails when it achieves "some material alteration of the legal relationship between them and their adversaries, *and* that change bears a judicial imprimatur" (quotation marks omitted) (emphasis in original)); *see also Rosario*, 749 F.2d at 1005 (applying the standards for awarding attorney's fees under 42 U.S.C. § 1988, in which context *Lackey* and *Perez* were decided, to LMRDA Title I).

The "material alteration" and "judicial sanction" elements overlap somewhat. The Second Circuit has held that an alteration in the legal relationship is "material" if "the plaintiff [is] entitled to enforce a judgment, consent decree, or settlement against the defendant." *DiMartile v. Hochul*, 80 F.4th 443, 451 (2d Cir. 2023) (quotation marks omitted). While the Supreme Court has rejected the idea that a party prevails if the litigation brings about a voluntary change in the defendant's behavior (the "catalyst theory"), it has affirmed that litigation resulting in an enforceable consent decree bears the requisite "judicial imprimatur" to render the plaintiff a prevailing party. *Buckhannon Bd. & Care Home*, 532 U.S. at 601, 605, 610 (rejecting the catalyst theory); *see id.* at 604 (noting that "we have held that settlement agreements enforced through a consent decree may serve as the basis for an award of attorney's fees"); *see also Lackey*, 604 U.S. at 207 (affirming the latter view).

The prevailing party must have conferred a "substantial benefit" on "members of an ascertainable class." *ACTWU*, 54 F.3d at 71 (quotation marks omitted). A substantial benefit is one that is "'more than technical in its consequence'" and which "'accomplishes a result which corrects or prevents an abuse'" that would prejudice the class members' "'essential right[s].'" *Cohen v. LyondellBasell Indus. N.V.*, 492 F. Supp. 3d 14, 17 (E.D.N.Y. 2020) (quoting *Mills*, 396 U.S. at 396). In the context of LMRDA claims, the benefit "must be grounded in something conferred upon the membership, not just upon individuals." *Doyle v. Turner*, 90 F. Supp. 2d 311, 320 (S.D.N.Y. 2000) ("*Doyle II*"), *aff'd sub nom. Hughley v. Loc. 1199, Drug, Hosp. & Health Care Emps. Union, RWDSU*, 231 F.3d 889 (2d Cir. 2000); *see Hall*, 412 U.S. at 8 (holding that when a union member vindicates his personal free-speech rights under the LMRDA, the resulting "preservation of union democracy" is a common benefit on the union members). That said, there is no requirement that all members benefit equally or near equally for the common benefit doctrine to apply. *See Ramey v. Dist. 141, Int'l Assoc. of Machinists & Aerospace Workers*, No. 99-CV-4341 (BMC) (RML), 2010 WL 3619708, at *9 (E.D.N.Y. Sept. 10, 2010). The rank-and-file members of a union are a paradigmatic example of an ascertainable class. *See Rodonich*, 52 F.3d at 35.

In the union context, courts generally find that costs can be spread proportionately among the class when the fees are reimbursable by the union treasury. *See id.*; *Doyle II*, 90 F. Supp. 2d at 319. However, if the costs cannot be proportionately spread — for example, if one member would benefit disproportionately, or the costs would be borne by those other than the beneficiaries of the litigation — courts will deny the requested fees. *See, e.g.*, *Ramey*, 2010 WL 3619708, at *10 (following remand from the Second Circuit on this issue, reiterating the court's prior finding that attorney's fees related to litigation concerning an award of money damages for individual plaintiffs

should be denied because those costs would not be "equitably spread" across "those who have benefitted from" the litigation); *Fase v. Seafarers Welfare & Pension Plan*, 79 F.R.D. 363, 365 (E.D.N.Y. 1978) (denying an award of an attorney's fee against a defendant pension fund where "the cost would be spread among all of the pensioners, in the absence . . . of a common benefit to all such pensioners"); *Writers Guild of Am., W., Inc. v. F.C.C.*, 423 F. Supp. 1064, 1160–61 (C.D. Cal. 1976) (denying a fee award when "the primary beneficiaries" of the litigation "are the viewing public at large," but costs would be borne by television network shareholders), *vacated on other grounds sub nom. Writers Guild of Am., W., Inc. v. Am. Broad. Co.*, 609 F.2d 355 (9th Cir. 1979). For this same reason, individual union members cannot be ordered to pay attorney's fees under the common benefit doctrine. *See Ferreira v. Loc. No. 145 Serv. Trades, Chauffeurs, Salesmen & Helpers, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. (Teamsters Loc. Union No. 145)*, 633 F. Supp. 133, 135 (D. Conn. 1985) (collecting cases).

## II. Analysis

Plaintiffs' motion for attorney's fees argues that counsel is entitled to fees because (1) the consent order and All Writs Act decisions rendered Plaintiffs successful litigants, and this success "benefitted the entire membership of the ALU," and (2) the fees sought are reasonable. Schwartz Decl., ECF 92–1, ¶¶ 2, 3; *see generally* Pls. Mem., ECF 92-3; Schwartz Suppl. Decl., ECF 97; *see also* Reply Mem., ECF 96. Plaintiffs further argue that any fee award should be payable by ALU-IBT Local 1, citing the affiliation agreement. *See* Pls. Mem., ECF 92-3, at 8; Schwartz Suppl. Decl., ECF 97, ¶ 9.

Defendants counter that (1) Plaintiffs were not prevailing parties under the common benefit doctrine because they did not maintain their initial claims; (2) counsel's motion is deficient because he did not provide the Court a copy of his retainer agreement with Plaintiffs, and his retainer "cards" are non-compliant with state

regulatory requirements; and (3) it would be inequitable "to raid the union treasury to pay legal fees." Defs. Mem., ECF 95, at 9 (capitalization modified); *see generally id.*; Defs. Suppl. Opp'n, ECF 98.

For the reasons discussed below, the Court finds that while Plaintiffs were successful litigants, a fee award is not available under the common benefit doctrine because the costs of the litigation cannot be spread proportionately across the beneficiaries of the litigation.[7]

## A. Plaintiffs Were Prevailing Parties

For the purposes of considering the application of the common benefit doctrine, the Court finds that Plaintiffs were successful litigants because the instant litigation resulted in an enforceable consent order that effected Plaintiffs' desired change: a democratic union election.

As discussed above, a party "prevails" when it achieves "some material alteration of the legal relationship between them and their adversaries, and that change bears a judicial imprimatur." *Perez*, 587 F.3d at 149 (quotation marks and emphasis omitted). Courts in the Second Circuit have observed that a litigation that culminates in an enforceable settlement or consent decree achieves exactly this. For example, in *Roberson v. Giuliani*, the parties settled § 1983 claims through a private agreement: the government defendants disclaimed liability but agreed to make certain policy changes responsive to the plaintiffs' demands. 346 F.3d 75, 77–78 (2d Cir. 2003). The parties

---

[7] As mentioned, because individual union officers cannot be ordered to pay attorney's fees under the common benefit doctrine, the Court respectfully recommends denying the requested fee award as to Defendant Smalls on this ground alone. *See Ferreira v. Loc. No. 145 Serv. Trades, Chauffeurs, Salesmen & Helpers, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. (Teamsters Loc. Union No. 145)*, 633 F. Supp. 133, 135 (D. Conn. 1985).

stipulated to dismissal, and the district court entered an order "retain[ing] jurisdiction over the settlement agreement for enforcement purposes." *Id.* at 78 (quotation marks omitted). The district court denied the plaintiffs' motion for attorney's fees, holding that its order retaining jurisdiction was not a sufficient "judicial sanctioning of the alteration of [the parties'] legal relationship." *Id.* at 80 (quotation marks omitted). The Circuit disagreed. It held that "when the district court retained jurisdiction [to enforce the settlement agreement,] it gave judicial sanction to a change in the legal relationship of the parties." *Id.* at 83. "Consent decrees are enforceable in federal court because they are orders of the court; the Agreement is enforceable in federal court because a violation of the Agreement is a violation of the court's dismissal Order." *Id.*

Here, similarly, the consent order achieved a material alteration in the legal relationship between Plaintiffs and Defendants because it forced each side to abandon its litigation position, "to work together to achieve their common end," to hold an election, and to discuss amending the union's constitution. Consent Order, ECF 46, ¶¶ 1–2, 18; *see also* Pls. Mem., ECF 92-3, at 1–5. It also set forth a procedure for appointing a neutral monitor to supervise this process. Consent Order, ECF 46, ¶¶ 15–16. The election that was brought about by the processes laid out in the consent order further enabled the individuals who had brought the suit to assume officer positions in the Union — a drastic change in the parties' "legal relationship." *Roberson*, 346 F.3d at 80; *see also New Leadership Comm.*, 23 F. Supp. 2d at 303 (adopting report and recommendation finding that the provisions of a settlement between rival union factions "generally benefitted the union membership" because they "reaffirm[ed] the commitment that union affairs would be conducted in accordance with established procedures; that union elections would be conducted in a fair and informed manner;

and that dissenting union members would not be subjected to disciplinary action or retaliation for exercising their rights to free speech").

More importantly, when Judge Donnelly entered the consent order, Plaintiffs became "entitled to enforce" it against Defendants, achieving the requisite judicial imprimatur. *DiMartile*, 80 F.4th at 451 (quotation marks omitted). And Plaintiffs did invoke their rights under the order. On April 14, 2024, Plaintiffs submitted a letter opposing Defendants' request for a conference regarding the intervention petitions, which Plaintiffs characterized as efforts to undermine the consent order. Pls. Letter, ECF 61; *see* Defs. Letter, ECF 60. Later, Plaintiffs' All Writs Act motion relied on the order's terms for authority. Mem. in Supp. of All Writs Act Mot., ECF 62-7, at 2 (seeking the court's assistance "to assure that the terms of the Consent Order are fully carried out").

The court also enforced the consent order on its own. For example, in an April 25, 2024 motion hearing, Judge Donnelly directed the parties to bring disputes about the election process to the neutral monitor, not the court, per the consent order. Apr. 25, 2024 ECF Min. Entry & Order; *see also* May 9, 2024 ECF Order (reminding the parties that they are bound to the terms of the consent order); June 21, 2024 ECF Order (denying a third party's motion for a preliminary injunction because, *inter alia*, the motion conflicted with the consent order).

Defendants' argument that Plaintiffs could not be successful because this litigation "[a]t most" settled the party's differences, rather than changing their legal relationship, misses the mark. Defs. Mem., ECF 95, at 1–2; *see also* Defs. Suppl. Opp'n, ECF 98, at 2, 4. While Defendants are correct that the Supreme Court rejected the "catalyst theory" in *Buckhannon Board & Care Home*, Defendants ignore the *Buckhannon* court's holding that "enforceable judgments on the merits *and* court-ordered consent decrees create the material alteration of the legal relationship of the parties necessary to

permit an award of attorney's fees." 532 U.S. at 604 (emphasis added) (quotation marks omitted). The Supreme Court in *Lackey v. Stinnie* recently affirmed this view, even as it held that winning a preliminary injunction did not confer prevailing party status, observing that "[t]he availability of fees following the entry of a court-ordered consent decree is fully consistent with the rule we announce today." 604 U.S. at 207; *see* Defs. Mem., ECF 95, at 5–6 (citing *Lackey* for the proposition that "the settlement agreement entered as a consent order did not reflect at all that Mr. Schwartz successfully maintained the claims he brought"). Moreover, the position advanced by Defendants' citation to *Lackey* is not supported by Second Circuit case law. It is not necessary that the consent order reflect that Plaintiffs successfully maintained or won any of their initial claims for Plaintiffs to be prevailing parties. *See, e.g.*, *Rodonich*, 52 F.3d at 33 (rejecting the proposition that "a finding of common benefit turns on whether or not equitable relief has been granted"); *Roberson*, 346 F.3d at 77–78, 82–84 (observing that a settlement agreement where the defendants disclaimed any liability was sufficient to render the plaintiffs the prevailing parties); *Stokely*, 2006 WL 2807161, at *2 (observing that the court need not find that the LMRDA was actually violated in order to award attorney's fees).

For the above reasons, the Court recommends finding that Plaintiffs were prevailing parties for purposes of evaluating the pending fee award application.

### B. Whether the Consent Order Conferred a Common Benefit Upon Members of an Ascertainable Class

As set forth above, the consent order laid out the terms by which a free and fair union election would be held. Accordingly, all members of the ALU benefitted from the consent order.

Under the common benefit doctrine, prevailing parties may be awarded attorney's fees where "the litigation has conferred a substantial benefit on the members of an ascertainable class." *ACTWU*, 54 F.3d at 71 (quotation marks omitted). Plaintiffs rely on *Hall v. Cole* and its Second Circuit progeny to illustrate this rule. Pls. Mem., ECF 92-3, at 3–5. In *Hall*, the Supreme Court found that a union member who had sued to vindicate his free speech rights under Title I of the LMRDA "contribute[d] to the preservation of union democracy" and therefore "necessarily rendered a substantial service to his union as an institution and to all of its members." 412 U.S. at 8. In *Rodonich*, another union free speech case, the Second Circuit held that the plaintiff achieved a common benefit, even though he won money damages and not injunctive relief, because the award "serve[s] as a check on the abuse of power and can promote the exercise of democratic rights by the rank and file." 52 F.3d at 33.

Here, Plaintiffs achieved a common benefit in winning an enforceable consent order that set forth a process for a democratic union election and constitutional amendments. The promotion of free and fair election procedures is core to the rights guaranteed by the LMRDA. *See* 29 U.S.C. § 411(a)(1) ("Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates [and] to vote in elections or referendums of the labor organization . . . ."); *Hall*, 412 U.S. at 7–8 (observing that Title I of the LMRDA was "specifically designed to promote the 'full and active participation by the rank and file in the affairs of the union'" (quoting *Am. Fed'n of Musicians v. Wittstein*, 379 U.S. 171, 182–83 (1964)); *Rodonich*, 53 F.3d at 32 (noting that the LMRDA Bill of Rights "effectively superimposes the core values of democratic governance . . . onto union operations"); *cf. Donovan v. CSEA Loc. Union 1000*, 784 F.2d 98, 104 (2d Cir. 1986) (stating, in the context of an

LMRDA Title IV action, that "the benefits from this successful litigation are not limited to the supervised rerun of one isolated election, but will continue to be felt in future [union] elections"). The existence of the consent order "deterr[ed] the union from denying members their due process procedural rights guaranteed by § 101 of LMRDA" and will continue to "encourag[e] union members to enforce those rights through § 102." *Rosario*, 749 F.3d at 1006; *see* Apr. 25, 2024 ECF Min. Entry (reminding the parties that they are bound by the terms of the consent order and must appeal to the neutral monitor for resolving disputes, following Defendants' submission of a letter requesting clarification on how the then-pending motions to intervene might affect the terms of the consent order and their obligations under Title I of the LMRDA). Future members of the ALU, now the ALU-IBT Local 1, will continue to benefit from Plaintiffs' efforts to allow "the members . . . to nominate candidates for office," to create "a free and open opportunity to campaign," and to ensure "5,000 members received ballots giving them a voice in deciding who was going to lead the union." Pls. Mem., ECF 92-3, at 2–3.

Accordingly, the Court recommends finding that Plaintiffs achieved a common benefit upon an ascertainable class of union members — that is, members of what is now the ALU-IBT Local 1.

### C. Whether Costs May Be Spread Proportionately

Notwithstanding the foregoing findings, because the costs of the requested attorney's fees cannot be spread proportionately among the members of the ALU-IBT Local 1, the Court respectfully recommends denying Plaintiffs' motion for attorney's fees.

Ordinarily, in LMRDA cases awarding fees under the common benefit doctrine, whether costs can be spread proportionately is not in dispute, because fees are reimbursable by the union treasury. *See, e.g., Rodonich*, 52 F.3d at 35. As the Second

Circuit observed in *Rodonich*, in cases involving a union, "(1) there is an ascertainable class of beneficiaries (the union membership), and (2) the fees are sought from *that class* (via the union treasury)." *Id.* at 35 (emphasis added). However, in rare cases, courts have denied attorney's fee requests where fees were *not* proportionately shareable. *Doyle*, a case also arising out of "rival factions of union officials over control of the union," is instructive on the limits of assuming the union treasury is available to pay the costs of litigation. *Doyle v. Kamenkowitz* ("*Doyle I*"), 114 F.3d 371, 373 (2d Cir. 1997).

In *Doyle*, defendants, former officers of a labor union, sought to recover attorney's fees after successfully defeating the union plaintiffs' claims.[8] *See id.*; *Doyle II*, 90 F. Supp. 2d at 313. Finding that the statutory fee-shifting provision of § 501(b) of the LMRDA did not create "a right of reimbursement against a union that is unwilling to pay," the Second Circuit reversed and remanded the case to the district court to assess whether a fee award was justified "on other grounds or rationales," such as the common benefit doctrine. *Doyle I*, 114 F.3d at 375, 378–79.

The district court, on remand, held that an award based upon general principles of equity or a common benefit analysis was not warranted. *Doyle II*, 90 F. Supp. 2d at

---

[8] Specifically, the *Doyle* plaintiffs — individual union members and the union itself — had brought claims under § 501(a) of the LMRDA, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and the New York Labor Law § 720 *et seq.* They alleged that:

> the defendant officers had breached their fiduciary duties to the Union by embezzling and converting Union funds and other assets, and had 'stolen' the Union's 1984 elections (and unsuccessfully tried to steal the 1986 elections as well) by stuffing ballot boxes; destroying valid ballots; denying Union members the right to vote; threatening, assaulting, and physically preventing members from exercising their rights under sections 7 and 8 of the National Labor Relations Act, 29 U.S.C. §§ 157, 158; and covering up their illegal acts through mail and wire fraud.

*Doyle I*, 114 F.3d at 373.

318. The court found, first, that the union officers' vindication of the claims against them did not inure a benefit to the union membership at large, and second, that their actions failed to "create or preserve the Union treasury fund," such that the costs of litigation could be shifted under traditional common fund principles. *Id.* at 321 (quotation marks omitted); *see also Cohen v. LyondellBasell Inds. N.V.*, No. 19-CV-2622 (EK) (SMG), 2020 WL 5097773, at *3 (E.D.N.Y. June 23, 2020) (observing that the Second Circuit applies the common fund doctrine broadly, incorporating the common benefit doctrine), *report and recommendation adopted as modified*, 492 F. Supp. 3d 14 (E.D.N.Y. 2020).

Here, Plaintiffs do not, and cannot, argue that their actions in obtaining the consent order "preserved or increased a common fund."[9] *Doyle II*, 90 F. Supp. 2d at 321. Indeed, it is not clear whether there is a common fund to tap at all. Unlike many of the other union democracy cases where the attorney's fee award was readily payable out of the union treasury — a common fund created by members' proportionate contributions of their dues — here, the ALU has agreed not to "charge members dues until they obtained a collective bargaining agreement." Mirer Decl., ECF 98-1, ¶ 9; *see* Defs. Mem. in Opp'n, ECF 95, at 9 (asserting that absent dues, the union has relied on public support); *see also* ALU 2022 & 2023 LM-2 Forms, ECF 101-3, 101-4 (reporting that the Union took in a total of $775 in dues and agency fees across 2022 and 2023, and almost

---

[9] Plaintiffs rely on the "general principle that a trust estate must bear the expenses of its administration, even if that administration results from the efforts of non-trustees," citing *Trustees of the Internal Improvement Fund v. Greenough*, 105 U.S. 527 (1881), for the conclusion that they are entitled to reimbursement. Pls. Mem., ECF 92–3, at 2. Though the *Hall* court cites *Greenough* with approval for the proposition that the common benefit doctrine originates in common fund cases, *see* 412 U.S. at 5 n.7, it is not apparent how the implicit analogy Plaintiffs draw between the ALU and a trust estate would operate to compel the result urged by Plaintiffs.

$1.5 million in "other receipts," but had $118,463 in net assets at the end of 2022 and negative $48,006 in net assets at the end of 2023); *cf.* ALU 2024 LM-2 Form, https://olmsapps.dol.gov/query/orgReport.do?rptId=918175&rptForm=LM2Form [https://perma.cc/HM58-4UEX] (reporting $0 in dues, $12,115 in other receipts, and $0 in net assets by June 17, 2024). Defendants assert that without the support of the Teamsters, following the unions' affiliation, the ALU — now ALU-IBT Local 1 — would not have been able to pay for election-related mailings. *See* Defs. Mem. in Opp'n, ECF 95, at 9. The declaration of David Suetholz, the Teamsters' general counsel, avers that to his understanding, "the ALU . . . does not exist anymore and has no assets." Suetholz Decl., ECF 98-3, ¶ 24; *see also* Palmer Decl., ECF 98-2, ¶ 46. Plaintiffs' counsel's assertions regarding the ALU's receipts for the calendar years 2022 and 2023 — prior to the June 2024 affiliation — are entirely consistent with Mr. Suetholz's statement about the present state of the ALU: in fact, counsel concedes that public contributions "stopped coming in" following the events underlying this lawsuit. Schwartz Second Suppl. Decl., ECF 101, ¶ 12; *see generally* ALU 2022 & 2023 LM-2 Forms, ECF 101-3, 101-4.

Taking these facts together, it is not at all clear that "it is possible to spread the costs proportionately among the members of the class" that reaped the benefits of Plaintiffs' litigation: the members of the ALU. *ACTWU*, 54 F.3d at 71. Courts in the Second Circuit have cautioned against this type of outcome. In *Fase v. Seafarers Welfare & Pension Plan*, an ERISA case, the Honorable Thomas C. Platt denied an attorney's fee award where an award — payable by the defendant pension fund — would spread the costs of the litigation among *all* pensioner contributors to the fund, where only the individual plaintiff benefitted from the lawsuit. 79 F.R.D. at 365. In *Ramey*, on remand from the Second Circuit, the Honorable Brian M. Cogan likewise emphasized that "[t]he purpose of an award of attorneys' fees is not to punish, but to equitably spread the cost

of litigation across those who have benefitted from it." 2010 WL 3619708, at *10; *cf. id.* (observing that, where attorneys' fees had previously been awarded in connection with an injunction, but counsel sought additional attorney's fees payable by the union related to an award of individual damages, "increasing the detriment to other union members is thus not going to bestow a 'substantial' additional benefit").

Framed another way, although there may be an ascertainable class of beneficiaries here, the fees counsel seeks are not "sought from *that class*" of beneficiaries. *Rodonich*, 52 F.3d at 35 (emphasis added). Rather, Mr. Schwartz expressly seeks fees from the ALU-IBT Local 1, which is now a chartered Teamsters local and wholly financially supported by the Teamsters "until such a time as ALU-IBT Local 1 has reached its first contract with Amazon and begun collecting dues from its members." Affiliation Agreement, ECF 97, at ECF p. 12 (§ III, ¶ 4). If counsel's fee motion were granted, the *Teamsters* membership writ large would end up footing the bill for this lawsuit, without enjoying any of the attendant benefits of the underlying litigation. *See* Burden Decl., ECF 98-4, ¶¶ 4–5 (stating that the Teamsters provides funding to the ALU-IBT Local 1 as necessary under the affiliation agreement); *see also* Defs. Mem., ECF 95, at 9; *cf.* Defs. Suppl. Opp'n, ECF 98, at 11.

Here, perhaps in acknowledgment that even were he awarded fees, he could not recover from the ALU given that entity's present lack of assets, Mr. Schwartz urges the Court to find that any fee award be "made payable by ALU-IBT Local 1." Schwartz Decl., ECF 92-1, ¶ 10; *see* Pls. Mem., ECF 92-3, at 1, 8. But Mr. Schwartz does not offer any authority in support of the proposition that the ALU-IBT Local 1 should be liable for the debts of its predecessor. *Cf.* Oct. 21, 2025 ECF Order (directing Mr. Schwartz to provide such authority). Rather, he asserts that "the Amazon Labor Union affiliated with the Teamsters Union before the election occurred" and that the ALU "did not dissolve, nor

did it change its constitution, nor was there a 'new' entity." Schwartz Suppl. Decl., ECF 97, ¶ 9. At bottom, he asserts that the sole effect of the affiliation agreement on the ALU was to "change its name to ALU-IBT Local 1," without engaging with Defendants' arguments that the affiliation agreement precludes the IBT from liability for ALU debts incurred prior to the affiliation, or analyzing how the Teamsters' membership writ large could somehow fall within the group upon whom a common benefit was conferred. *Id.*; *see* Defs. Mem., ECF 95, at 9; *see also* Suetholz Decl., ECF 98-3, ¶¶ 20–21, 24; Affiliation Agreement, ECF 97, at ECF p. 13 (§ VIII, Assets and Liabilities); *id.* at ECF p. 14 (calling attention to a provision stating that "ALU-IBT Local 1 is the successor in interest to ALU under this Agreement" in the context of NLRB certification). On the highly unique facts of this case, it would not serve the equitable principles underlying the common benefit doctrine to compel the members of what is now the parent union to pay the costs of a litigation that only benefitted members of what was, at the time of the litigation, a new, independent union.

The Court is not convinced by Mr. Schwartz's conclusory assertions that the ALU-IBT Local 1 is or should be responsible for attorney's fees allegedly payable by the ALU. Traditional common law principles dictate that successor liability attaches where the acquiring entity "expressly or impliedly assumed the predecessor's tort liability, there was a consolidation or merger of seller and purchaser, the [acquiring entity] was a mere continuation of the [acquired entity], or the transaction is entered into fraudulently to escape such obligations." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006) (quotation marks and numeration omitted). The affiliation agreement here expressly disclaims liability for the respective parties' prior debts, and, as mentioned, Mr. Schwartz has offered no authority that would support a finding of successor liability for consolidation, continuation, or fraud, much less in the *common*

*benefit fund context. See* Affiliation Agreement, ECF 97, at ECF p. 13 (§ VIII, Assets and Liabilities). Moreover, neither Mr. Schwartz nor defense counsel offers any authority, and the Court can find none, applying these principles to inter-union affiliation agreements, as opposed to corporate mergers. *But cf. Rodonich v. House Wreckers Union Loc. 95 of Laborers' Int'l Union*, 817 F.2d 967, 973 (2d Cir. 1987) (announcing rule that international union may be liable for unlawful acts of affiliate if unlawful act was ratified "with full knowledge" of the affiliate's unlawful conduct). Nor does Mr. Schwartz offer authority to explain why the NLRB's treatment of the ALU-IBT Local 1 as the successor in interest of the ALU *for the purpose of union certification* should impact the Court's analysis of the applicability of the common benefit fund doctrine. *See* Schwartz Second Suppl. Decl., ECF 101, ¶ 8. In the absence of any authority on this point, the Court recommends against awarding any attorney's fee made payable by the ALU-IBT Local 1, as much as an order would be, in effect, an order against the IBT itself.

The requested fee award would not spread costs of the litigation proportionately among members of the ALU. Rather, it would shift those costs to a group of union members who did *not* get the benefits of the litigation.[10] Accordingly, the Court recommends denying Plaintiffs' attorney's fee motion in its entirety.

_____

[10] The Court notes that is not necessary that the litigation *create* a common fund in order to award fees out of it. *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392 (1970) (observing that "[t]he fact that this suit has not yet produced, and may never produce, a monetary recovery from which the fees could be paid does not preclude an award based on this rationale"); *see also id.* at 392–95 (collecting cases). The key obstacle here is not the absence of common fund at the

### D.  Other Equitable Considerations

The Court is mindful that "apprais[ing] the need for and potential benefits derived from the attorney's services" in this context will often weigh in favor of a fee award. *Rosario*, 749 F.2d at 1004. Specifically, the LMRDA rights at issue "otherwise might not be vindicated" if attorneys were unwilling to take on dissident union members' cases absent the possibility of fee-shifting, particularly in cases where, as here, a newly formed union has not yet established a central treasury. *New Leadership Comm.*, 23 F. Supp. 2d at 305; *see also Rodonich*, 52 F.3d at 32–33. These rights are no less important, nor less in need of protection, when they derive from a nascent union's growing pains rather than an established union's institutional retrenchment. Given these concerns, the Court does not endorse the view that fee-shifting should *never* be available when the common benefit of a litigation does not result in, or cannot be traced to, a common fund. However, here, where the costs of litigation cannot "be shifted with some exactitude to those benefitting," a fee award is not fair or justifiable under existing doctrine. *Boeing*, 444 U.S. at 479 (quotation marks omitted).

The Court is also mindful that the purpose of the common benefit doctrine is to avoid unjustly enriching individuals who benefit from a lawsuit without contributing to its cost. *See id.* at 478; *ACTWU*, 54 F.3d at 71. This concern is particularly acute here, where the individuals who brought the case as Plaintiffs are today officers of the

---

present juncture, but rather that it is not "possible to spread the costs proportionately among the members of the class" that benefitted from the litigation — members of the ALU — insofar as Mr. Schwartz seeks a fee award payable by the ALU-IBT Local 1, an entity that is financially supported by the Teamsters. *ACTWU*, 54 F.3d at 71; *see Rodonich v. Senyshyn*, 52 F.3d 28, 35 (2d Cir. 1995); *see also* ALU 2022 & 2023 LM-2 Forms, ECF 101-3, 101-4; ALU 2024 LM-2 Form, https://olmsapps.dol.gov/query/orgReport.do?rptId=918175&rptForm=LM2Form [https://perma.cc/HM58-4UEX] (reporting that the Union took in $0 in dues in 2024 through June 17, 2024).

Defendant Union because of the election brought about by the consent order. Still, that Plaintiffs ultimately obtained "a direct benefit not shared by the rest of the membership" was not a direct outcome of the litigation — it was the result of an election — and does not change the analysis above. *Rodonich*, 52 F.3d at 35.

Notwithstanding these important considerations, the Court's "intimate familiarity with the case" and the lead Plaintiffs gives rise to another significant concern about the pending fee application. *Id.* at 33 (quotation marks omitted). On the present record, is not at all clear that Plaintiffs understood that their attorney would seek a substantial fee award from their nascent union in the event they prevailed. Indeed, Plaintiffs' counsel's own declarations as to his method for gathering Plaintiffs and his statements to them regarding his fees seriously call into question whether Plaintiffs were fully and fairly informed about the possible fee consequences of this litigation. Mr. Schwartz represents that lead plaintiffs, not counsel, circulated retainer cards among potential plaintiffs, then "entered those individuals[' names] on an Excel spreadsheet," which was then "transmitted to" counsel, and that counsel "presently cannot locate" the originals of the retainer cards. Schwartz Suppl. Decl., ECF 97, ¶ 2. The "retainer cards" in question are captioned "Plaintiff Interest Form," where signatories agree that they "would like to be named as a plaintiff in the legal complaint against the current leadership of the Amazon Labor Union for their refusal to hold scheduled elections for officer positions." *Id.*, at ECF p. 5 ("Ex. A"). As a general rule, in New York, an attorney's letter of engagement or retainer agreement must explain "the scope of the legal services to be provided" and the "attorney's fees to be charged." N.Y. Comp. Codes R. & Regs. tit. 22 § 1215.1(b). But Mr. Schwartz avers that he "simply told [lead Plaintiffs Spence, Sylla, Kathleen Cole, and Sultana Hossain] that I would do the case

without charging them a fee, and that I would seek attorney's fees from the union if we were successful." Schwartz Suppl. Decl., ECF 97, ¶ 3.

Contrary to Defendants' arguments, these deficiencies do not necessarily scuttle a fee award *ex ante*, particularly in the fee-shifting context. *See Marion S. Mishkin L. Off. v. Lopalo*, 767 F.3d 144, 148 (2d Cir. 2014) (restating the rule that an attorney's fee award requires only that it be supported by "contemporaneous time records . . . specify[ing], for each attorney, the date, the hours expended, and the nature of the work done" (quotation marks omitted)); *Zhang v. Zhang*, No. 16-CV-4013 (LGS) (SLC), 2021 WL 1154084, at *4 (S.D.N.Y. Mar. 26, 2021) (rejecting the plaintiff's argument that defendants' failure to submit a retainer agreement precluded a fee award); *cf. Popal v. Slovis*, No. 12-CV-3916 (LGS), 2015 WL 10687614, at *7 (S.D.N.Y. Apr. 28, 2015) (applying New York state law; observing that an attorney may recover his fee *in quantum meruit* even if his retainer was deficient).

However, counsel's representations raise considerable questions about whether the 80-plus named Plaintiffs in this case fully understood their role in this litigation and the potential consequences of hiring counsel, a concern raised by Defendants in the declaration of Derrick Palmer. *See generally* Palmer Decl., ECF 98-2; *see also* Defs. Suppl. Opp'n, ECF 98, at 9 (speculating about the possibility of "ghost plaintiffs"). While the Court does not credit hearsay assertions contained in Mr. Palmer's declaration, the Court is doubtful that the process counsel described here would ensure Plaintiffs knew about "the scope of the legal services to be provided" or the "attorney's fees to be charged." N.Y. Comp. Codes R. & Regs. tit. 22, § 1215.1(b).

In addition, given the Court's familiarity with the parties here, including the named Plaintiffs, the Court is highly skeptical that the fees counsel seeks are consistent with "the rate a paying client would be willing to pay" for legal representation in this

case given the exceedingly unique circumstances of the litigation. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany* ("*Arbor Hill*"), 522 F.3d 182, 190 (2d Cir. 2008); *see also* Burden Decl., ECF 98-4, ¶¶ 7–8 (asserting that Plaintiff Spence had not promised counsel compensation in this case and understood that representation was being provided pro bono). Of course, an agreement to provide pro bono representation does not bar recovery of attorney's fees on its own. *See, e.g.*, *Parris v. Pappas*, 844 F. Supp. 2d 262, 269 (D. Conn. 2012) (rejecting the argument that where representation was pro bono, a reasonable paying client "would expect to pay nothing" (citing *Arbor Hill*, 522 F.3d at 182 n.2)). Here, however, counsel has not provided a basis from which to infer that his clients — current and former Amazon warehouse workers — "would be willing to pay" him $675 per hour for nearly 200 hours of work. *Arbor Hill*, 522 F.3d at 190. As discussed, counsel "simply told [lead Plaintiffs] that I would do the case without charging them a fee, and that I would seek attorney's fees from the union if we were successful." Schwartz Suppl. Decl., ECF 97, ¶ 3. He does not contend that Plaintiffs — lead or otherwise — understood his rate, the anticipated scope of work, or anything else that could allow them to assess what monetary value they attributed to counsel's services and make an informed decision to engage his services. Accordingly, the Court has substantial reservations as to whether Plaintiffs fully understood the possible fee consequences of signing counsel's "Plaintiff Interest Form[s]." This additional concern strongly militates against awarding the fees counsel seeks, in an exercise of discretion.

An award of attorney's fees is not mandatory, and lies within the Court's discretion.[11] *See Rodonich*, 52 F.3d at 33. For all of the reasons discussed above, the Court respectfully recommends finding that attorney's fees should not be awarded in this case.

## CONCLUSION

For the foregoing reasons, the Court respectfully recommends denying Plaintiffs' counsel's motion for attorney's fees in its entirety. Notwithstanding this recommendation, the Court is sympathetic to the fact that counsel advanced litigation costs for this case, and commends Mr. Schwartz's zealous advocacy on behalf of his clients. The Court also has concerns that this ruling could chill attorneys from taking on similar representations in the future. These concerns do not, however, alter the Court's ultimate conclusion that forcing a different group of union members to pay the costs of

---

[11] Even if counsel had demonstrated that attorney's fees should be awarded, the Court's "personal observation of counsel's performance" and review of the fee application indicate that the full fee award counsel requests is not warranted here. *Rosario*, 749 F.2d at 1004. If the Court were to recommend a fee award, some substantial reductions would be appropriate. First of all, counsel's rate exceeds the typical forum rates for this District. *See Rubin v. HSBC Bank USA, NA*, 763 F. Supp. 3d 233, 243–44 (E.D.N.Y. 2025) (determining that the upper end of the forum rates in the Eastern District of New York, adjusted for inflation, is $450–$650 per hour for partners). In addition, although counsel ably represented his clients through the process of negotiating the consent decree, as the undersigned witnessed firsthand at the December 2023 settlement conference, counsel's time records contain some inaccuracies and inconsistencies, casting doubt on their completeness and accuracy, which could lead to an across-the-board reduction. *See* Billing Records, ECF 92-2; *see also Marion S. Mishkin L. Off. v. Lopalo*, 767 F.3d 144, 148 (2d Cir. 2014) (noting that failure to submit contemporaneous time records will result in the denial of attorney's fees in the usual course). For example, counsel submits that he billed one hour on October 11, 2024, for "Conference with Judge Donnelly." Billing Records, ECF 92-2, at 3. However, a review of the docket shows that no such conference took place on that date; on October 16, 2024, a 39-minute conference was held before Magistrate Judge Merkl, but Mr. Schwartz's time entries do not reflect this hearing. *Compare* Oct. 16, 2024 ECF Min. Entry & Order *with* Billing Records, ECF 92-2. Accordingly, were the Court to recommend awarding fees — which it does not for the reasons discussed above — it would also recommend reducing the requested fee award. Given the foregoing recommendation, however, the Court declines to conduct a full line-by-line analysis of the billing records here.

litigation incurred by a newly formed union is manifestly unfair and legally unsupportable.

*   *   *   *   *

This report and recommendation will be filed electronically. Objections to this report and recommendation must be filed, with a courtesy copy sent to the Honorable Ann M. Donnelly at 225 Cadman Plaza East, Brooklyn, New York 11201, within fourteen (14) days of filing. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a) (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal both before the district court and appellate courts. *See, e.g.*, *Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate[ judge's] decision" (quotation marks omitted)).

**SO ORDERED.**

Dated:  Brooklyn, New York
        January 26, 2026

*Taryn A. Merkl*
TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE